**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW BEWLEY and RYAN BEWLEY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Case No.: 1:23-CV-15570 |
| | ) | |
| THE NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The Plaintiffs, Matthew Bewley and Ryan Bewley (hereinafter "Plaintiffs"), by their attorneys, Dominique Price, Dan McGrath, and Marcos Reilly of Hinshaw & Culbertson LLP, pray for a temporary restraining order and preliminary injunction against the enforcement of the determination of Plaintiffs' ineligibility to participate in collegiate athletics by Defendant, the National Collegiate Athletic Association (hereinafter "Defendant" or "NCAA"), and in support thereof, state as follows:

**INTRODUCTION**

Over the last decade, federal courts have gradually chipped away at the NCAA's regulations limiting compensation to current and prospective student-athletes. On August 8, 2014, the United States District Court for the Northern District of California found that the NCAA violated antitrust law by limiting the compensation its member institutions could provide to their student-athletes. *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 1009 (N.D. Cal. 2014). The 9th Circuit Court affirmed this decision in part stating that "the NCAA's rules [regarding compensation] have been more restrictive than necessary to maintain its tradition of amateurism

96968\315051561.v2

in support of the college sports market." *O'Bannon v. NCAA*, 802 F.3d 1049, 1079 (9th Cir. 2015). In the wake of the *O'Bannon* decision, the NCAA maintained its regulations prohibiting student-athletes from profiting from the use of their name, image, and likeness ("NIL"). In an effort to curb some of its more hypocritical practices, the NCAA restricted some of its own for profit endeavors licensing the use of student-athletes' NIL.[1] However, the fact remained that collegiate athletics continued to be a billion dollar industry with an unpaid labor force after *O'Bannon*.[2]

The next major shift in the landscape of collegiate athletics would come following the Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021). On June 21, 2021, the United States Supreme Court found that the NCAA implemented anticompetitive bylaws unreasonably limiting the education related compensation and benefits that student-athletes might receive in exchange for their athletic participation. *Id.* The court unanimously found the Defendant's compensation rules limiting student-athlete compensation again violated the Sherman Act. *Id.* Though the relief sought by the *Alston* plaintiffs focused on additional compensation such as graduate degrees, vocational school, computers, and tutoring, *id.* at 2165, in a concurring opinion, Justice Kavanaugh stated that the Defendant's remaining noneducation-related compensation restrictions and rules may no longer be legally justified and that the Defendant is "not above the law." *Id.* at 2169 (Kavanaugh, J., concurring).

Justice Kavanaugh stated further,

"The NCAA couches its arguments for not paying student athletes in innocuous labels. But the labels cannot disguise the reality: The NCAA's business model

---

[1] Steve Berkowitz, *NCAA ending deal with video game maker EA*, USA Today, July 17, 2013, https://www.usatoday.com/story/sports/ncaaf/2013/07/17/ncaa-ending-videogame-contract-with-ea-electronic-arts/2525843/

[2] Associated Press, *NCAA earns $1.15 billion in 2021 as revenue returns to normal*, February 2, 2022, https://www.espn.com/college-sports/story/_/id/33201991/ncaa-earns-115-billion-2021-revenue-returns-normal

96968\315051561.v2

would be flatly illegal in almost any other industry in America. All of the restaurants in a region cannot come together to cut cooks' wages on the theory that 'customers prefer' to eat food from low-paid cooks. Law firms cannot conspire to cabin lawyers' salaries in the name of providing legal services out of a 'love of the law'… Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work. Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product."

*Id.* at 2167-68.

Following the *Alston* decision, effective July 1, 2021, the NCAA adopted a new "interim" Name, Image, and Likeness policy which suspended the Defendant's enforcement of many NIL restraints and restrictions and allowed prospective and current student-athletes to receive compensation for the sale of their NIL rights in accordance with state law.[3] Effective July 1, 2021, the State of Georgia, where the Plaintiffs attended high school, passed its own NIL statute addressing the rights of student-athletes to earn compensation for the use and or sale of their NIL rights.[4] The effect of the respective state statutes was to prevent the NCAA or other governing bodies from punishing student-athletes with the threat of ineligibility for exercising these rights. *See e.g.* 110 ILCS 190/15(a). The present causes of action are grounded in the enforcement of these state statutes, as well as enforcing federal antitrust principles pursuant to Section 1 of the Sherman Act.

First, Plaintiffs seek declaratory relief to enforce the provisions of the Student-Athlete Endorsement Rights Act under 735 ILCS 5/2-701. Plaintiffs request that the court determine that Plaintiffs' respective contracts with OTE are NIL contracts, and that the NCAA is prohibited by

---

[3] See Name | Image | Likeness Interim NIL Policy, ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf (last visited October 24, 2023).

[4] It is important to note that the force and effect of state statutes like O.C.G.A. Title 20, Ch. 3, Art. 13 were not to grant permission to student-athletes to profit from their NIL. These rights existed under the common law right of publicity for all citizens. *See e.g. Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc.*, 296 S.E.2d 697 (Ga. 1982).

96968\315051561.v2

state law from declaring Plaintiffs ineligible for competition in intercollegiate athletics based on these contracts. In the alternative, Plaintiffs seek to enjoin the Defendant from enforcing NCAA Bylaw 12.2.3.2.1 in manor that is arbitrary in light of its own policies and prior decisions, and unlawful pursuant to antitrust laws.

## STATEMENT OF FACTS

Plaintiffs, Matthew and Ryan Bewley, are highly rated prospective student-athletes from Ft. Lauderdale, FL. Prior to entering their Junior year of high school, the Bewleys were afforded an opportunity to join Overtime Elite ("OTE") a newly created, accredited, private high school, located in Atlanta, Georgia. OTE was designed to prepare elite prospective student-athletes to get to the next level both academically and athletically.

In the wake of changing tides precipitated by the passage of state statutes regarding NIL and Defendant's own prior statements[5], Overtime Elite added an additional element to the existing prep school scholarship model. In addition to the traditional benefits such as room, board, tuition, books, supplies, equipment, academic services, apparel, and transportation provided under the previous scholarship model, OTE would provide additional compensation in exchange for the use of the student-athletes' NIL. Overtime Elite, through its sports media marketing parent company Overtime Sports, Inc., would then earn money from marketing social media content, game broadcasts, player jerseys, autographs, reality TV programming, merchandise and any other NIL opportunities. To that effect, Plaintiffs signed an agreement, effective July 1, 2021, with Overtime Elite which included (a) an athletic scholarship to attend the Overtime Elite Academy and play basketball for Overtime Elite; and (b) a sale and transfer of Plaintiffs' NIL rights to Overtime Elite in exchange for a negotiated market value compensation

---

[5] Board of Governors moves toward allowing student-athlete compensation for endorsements and promotions, ncaa.org, April 29, 2020, https://www.ncaa.com/news/ncaa/article/2020-04-29/board-governors-moves-toward-allowing-student-athlete-compensation-endorsements-and (last visited November 1, 2023).

4

package. The benefits covered by the academic scholarship offered to the Plaintiffs are the same as those offered by numerous accredited academic institutions in the United States and deemed legal and permissible under Defendant's bylaws and policies.

Pursuant to its July 1, 2021 interim NIL policy, Defendant specifically allows for prospective student-athletes to use professional service providers to assist student-athletes in securing NIL deals.[6] Overtime Elite and its parent company, Overtime Sports, Inc. are digital media marketing companies already recognized by the Defendant as professional service providers in securing NIL deals for their student-athletes. In February 2022, the Defendant announced that Overtime Elite student-athletes were allowed to play on AAU basketball teams in NCAA certified amateur tournaments.[7] The Defendant also permitted Overtime Elite student-athletes to participate in NCAA certified events such as the National Basketball Players Association Top 100 High School Basketball Camp. The Plaintiffs participated in these NCAA certified events with the approval of the Defendant while attending Overtime Elite Academy. At no time did the Defendant object to the Plaintiffs' participation in these NCAA certified amateur events.

In June 2023, Plaintiffs graduated from Overtime Academy and received their high school diplomas as acknowledged by the NCAA. In June 2023, Plaintiffs sent a memorandum to the NCAA Eligibility Center indicating that Plaintiffs intended to initiate and complete the NCAA Eligibility and Amateurism Certification. Within 24 hours of this notification, the NCAA Eligibility Center reached out to the Compliance Officer at Chicago State University (hereinafter

---

[6] See Name | Image | Likeness Interim NIL Policy, ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf (last visited October 24, 2023).

[7] Travis Branham, *Overtime Elite players now allowed to participate in AAU, NCAA certified events*, 247sports.com, February 14, 2022, https://247sports.com/article/overtime-elite-players-allowed-to-participate-in-aau-and-ncaa-certified-events-182852752/

96968\315051561.v2

"Chicago State"), and indicated that Plaintiffs would likely be ineligible for collegiate competition because they previously played for a professional team (OTE) and received compensation in excess of actual and necessary expenses. In July 2023, the Plaintiffs completed their NCAA online certification application and submitted all documents regarding the Plaintiffs academic scholarship and NIL compensation deal with Overtime Elite to the Defendant for review.

Plaintiffs responded to repeated requests for additional information from the Defendant in July, August, September and October of 2023. Despite four months of time passing since the initial filing requesting certification of eligibility, the Defendant continued to delay its final determination. Even though the Defendant severely delayed its determination of the Plaintiffs' Amateur Certification, the Defendant timely certified the Plaintiffs as Academically Eligible to attend an NCAA member institution based on their academic record at Overtime Elite Academy.

Plaintiffs' former teammates, Robert Dillingham and Kanaan Carlyle attended Overtime Elite Academy and signed an agreement with OTE that provided for substantially similar education-related benefits and substantially similar NIL compensation as the agreement signed by Plaintiffs. Dillingham and Carlyle played on the same Overtime Elite basketball teams as the Plaintiffs and attended the same classes and graduated at the same time as the Plaintiffs. Unlike the Plaintiffs who waited four months for a decision regarding their amateur certification, the Defendant granted Dillingham and Carlyle's amateur certifications so they could attend and play basketball for their respective universities, the University of Kentucky and Stanford University.

On October 31, 2023, the Defendant finally issued a ruling declaring that the Plaintiffs were not eligible to compete in intercollegiate athletics. The reasons the Defendant gave for denying the Plaintiffs' petition for eligibility on October 31, 2023, were the same reasons the

96968\315051561.v2

Defendant stated they would deny the Plaintiffs request in June 2023. However, the Defendant has not provided any explanation as to why the Plaintiffs' request for certification was delayed for almost four months while Dillingham and Carlyle's requests were processed allowing them to participate in activities with their college teams since the Summer.

Plaintiffs' first official basketball game for Chicago State is scheduled for November 6, 2023, which is more than four months after the Plaintiffs first filed their complete application for amateur certification with the Defendant. Defendant's delay in issuing a final determination in the Plaintiffs case has caused and will continue to cause irreparable harm to the Plaintiffs by not allowing them proper time to appeal Defendant's decision prior to the start of the season. Plaintiffs and Chicago State will suffer immediate irreparable harm as a result of Defendant's decision to unfairly punish Plaintiffs contrary to its prior decision regarding Plaintiffs' teammates under similar circumstances. For these reasons, and as discussed further below, Plaintiffs seek a temporary restraining order and preliminary injunction, preventing the NCAA from declaring Plaintiffs ineligible to compete.

## **ARGUMENT**

The federal courts have power to issue a temporary restraining order and preliminary injunction where the moving party has demonstrated "(1) some likelihood of prevailing on the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied." *Erickson vs. Trinity Feeder, Inc.,* 13 F.3d 1061, 1067 (7th Cir., 1988). If the movant makes that showing, then the court must consider "(3) irreparable harm the non-movant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will

have on non-parties." *Id.* The Complaint establishes the need for a temporary restraining order and preliminary injunction in accordance with *Erickson*.

## I.      Plaintiffs have shown some likelihood of success on the merits.

### A.      State Law Claims

Plaintiffs are entitled to declaratory judgment pursuant to federal statute.[8] Here, there is an actual controversy as to whether the proposed action by the NCAA is permitted under applicable state law. The Plaintiffs in turn seek declaratory relief regarding the construction of the Student-Athlete Endorsement Rights Act and a declaration of their rights under the Act. Additionally, Plaintiffs maintain an implied right of action to enforce the Student-Athlete Endorsement Rights Act. As prospective student-athletes wishing to compete in intercollegiate athletics in the State of Illinois, Plaintiffs are the intended beneficiaries of the statute and seek to remedy the very harm it was designed to prevent. The legislative purpose of the Student-Athlete Endorsement Rights Act aligns with such an action, and recognition of an implied right is essential to provide an adequate remedy under the statute and prevent the NCAA's violations of Illinois law. *See Rodgers v. St. Mary's Hospital*, 149 Ill. 2d 302, 308 (1992).[9]

The Illinois Student-Athlete Endorsement Rights Act, was enacted to prevent the precise action taken by the Defendant in this case. Specifically, 110 ILCS 190/15(a) states,

> "Compensation from the use of a student-athlete's name, image, likeness, or voice
> may not affect the student-athlete's scholarship eligibility, grant-in-aid, or other

---

[8] *See* 28 U.S.C.A. §2201 ("In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration...")

[9] Illinois courts have repeatedly recognized a private right of action, under varied laws, including the Illinois Constitution, where plaintiffs meet these prongs. *See, e.g., Sherman v. Field Clinic*, 74 Ill. App. 3d 21, 29 (1979) (affirming that courts found an implied right under Article I, Section 17 of the 1970 Illinois Constitution prohibiting sex discrimination, the Election Code, the Workman's Compensation Act, the Federal Safety Appliance Act, the Retail Installment Sales Act, and the Consumer Fraud Act)

96968\315051561.v2

financial aid, awards or benefits, or the student-athlete's intercollegiate athletic eligibility…"

It is undisputed, based on the face of the contract, that the Bewleys sold their NIL rights to OTE in exchange for compensation. The NCAA simply ignores this undisputed fact because the compensation package is described as a "salary" in the Bewleys contract while later versions of the OTE contract described the compensation as a "scholarship," "financial aid," and NIL compensation. However, as Justice Kavanaugh noted in *Alston*, the NCAA cannot hide behind labels to disguise reality. It is undisputed that the NCAA has declared the Bewleys ineligible based on the terms of the compensation they received in exchange for use of their NIL. This is not only inconsistent with the NCAA's own interim NIL policy and its previous decisions involving Plaintiffs' teammates,[10] the NCAA's actions are a direct violation of Illinois law pursuant to 110 ILCS 190/15(a). Based on the plain language of the statute and the NIL related terms in the OTE contract, Plaintiffs have shown a high likelihood of success on the merits. A preliminary injunction and temporary restraining order are necessary to prevent irreparable harm to the Plaintiffs, and the Plaintiffs are entitled to this relief under Illinois state law.[11]

**B.    Federal Law Claims**

**i.    The NCAA bylaws restricting student-athlete compensation are unlawful restraints of trade.**

It is undisputed that Defendant's regulations limiting compensation for current and prospect student-athletes unlawfully restrain trade. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1079 (9th Cir. 2015) ("…the NCAA is not above the antitrust laws, and courts cannot and must not shy away from requiring the NCAA to play by the Sherman Act's rules. In this case, the NCAA's

---

[11] Plaintiffs assert that they are entitled the requested relief based solely on their state claims.  Plaintiffs assert additional claims based on federal antitrust law, in the event this court finds that they are not entitled to relief based on their state law claims.

96968\315051561.v2

rules have been more restrictive than necessary to maintain its tradition of amateurism in support of the college sports market."); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021) ("The NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition.")

In particular, Plaintiffs challenge the NCAA's cap on compensation received by prospective student-athletes as members of a professional team under NCAA Bylaw 12.2.3.2.1, which states, "[i]n sports other than men's ice hockey and skiing, before initial full-time collegiate enrollment, an individual may compete on a professional team (per Bylaw 12.02.12), provided the individual does not receive more than actual and necessary expenses to participate on the team." In prior communications to the Plaintiffs, the NCAA has cited this bylaw as justification for excluding the Plaintiffs from intercollegiate competition. In light of the amateur certification of their former teammates and OTE student-athletes' participation in NCAA sanctioned events, Plaintiffs disagree with the NCAA's classification of OTE as professional team as it contradicts their own actions and policy statements.[12] However, for the sake of the antitrust analysis, Plaintiffs only address the NCAA's cap on compensation for prospective student-athletes competing on such teams.

Here, as in the cases that preceded *Alston*, the NCAA has placed an artificial wage cap on a particular subset of athletes. *See In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019) ("Defendants hold monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits."); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2167-68 (2021) (concurring) ("Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it

---

[12] The NCAA cannot by its actions treat Overtime Elite as an amateur high school showcase and then later declare it to be a professional league only for two specific individuals. Such selective enforcement is an abuse of power that cannot survive judicial scrutiny under the rule of reason.

96968\315051561.v2

extinguishes the free market in which individuals can otherwise obtain fair compensation for their work.")

In this case, Defendant seeks to depress the wages of prospective student-athletes on professional teams. The NCAA has fixed this amount to what it deems as actual and necessary expenses. However, effective July 1, 2021, as a result of the new NCAA policy, student-athletes are specifically permitted by the NCAA to be compensated for use of their NIL without any cap. This new policy announced by the NCAA removes the cap on compensation above actual and necessary expenses as long as such compensation is earned through the sale or transfer of NIL rights. The Plaintiffs, Dillingham, and Carlyle all earned the same compensation package while attending Overtime Elite. This compensation was based on the sale and transfer of their NIL rights. Despite this similarity, the NCAA concluded that one set of athletes earned permissible compensation pursuant to an NIL deal while the Plaintiffs were found to violate NCAA bylaws. This distinction is based solely on how the compensation is labeled in their respective agreements. The NCAA's enforcement of NCAA bylaw 12.2.3.2.1 is arbitrary and an unlawful restraint of trade in violation of antitrust laws.

ii.   **The NCAA's enforcement of bylaws restricting student-athlete compensation is an unlawful group boycott.**

"Group boycotts, or concerted refusals to deal with others…" and "have long been held to be forbidden under the Sherman Act." *Karlberg European Tanspa, Inc. v. Jk-Joseph Kratz Vertriebsgesellschaft mbH*, Case No. 87 C 20458, 1991 U.S. Dist. LEXIS 20526, at *15 (N.D. Ill. Sep. 30, 1991). "A group boycott occurs when a plaintiff's competitors are in a position to deal with the plaintiff but agree to not do so." *Id.* "[S]uch agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*,

11

340 U.S. 211, 213, 71 S. Ct. 259, 260 (1951). Several courts have determined that the NCAA's regulations constitute an illegal group boycott. *See e.g. Bd. of Regents v. Nat'l Collegiate Athletic Asso.*, 546 F. Supp. 1276, 1313 (W.D. Okla. 1982) ("The Court has no difficulty in concluding that NCAA has organized a group boycott.").

The market in the present case was defined in the *O'Bannon* case and adopted in subsequent cases. *See In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1066 (N.D. Cal. 2019) ("[A]t the request of both parties and in the absence of a genuine issue of material fact, the Court adopted the market definition from the *O'Bannon* case.") "Under the theory of monopsony, sometimes referred to as a buyers' cartel, schools were characterized as buyers and student-athletes as sellers in a market for recruits' athletic services and licensing rights." *Id.* In this market, under NCAA Bylaw 12.2.3.2.1, the NCAA and its member institutions as buyers of athletic talent have collectively refused to deal with an entire category of sellers, including Plaintiffs.[13] The NCAA and its member institutions have enforced a complete ban on the Bewleys and similarly situated prospective student-athletes, who the NCAA unilaterally deems as having received compensation from a professional team above their "actual and necessary" threshold. The complete ban in the present case makes even less sense when the NCAA's own policy specifically allows student-athletes to earn compensation in excess of necessary and actual expenses via NIL deals. This group boycott has a dually anticompetitive effect. Firstly, it shrinks the pool of talent that is eligible for competition in intercollegiate athletics by excluded Plaintiffs and similarly situated prospective student-athletes and secondly, it depresses the wages of young athletes that aspire to compete in intercollegiate athletics. For

---

[13] In addition to the Bewleys and some of their classmates from OTE, this group often includes international prospective student-athletes who competed for professional teams in their respective countries.

96968\315051561.v2

these reasons, the NCAA's enforcement of Bylaw 12.2.3.2.1 is an unlawful group boycott in violation of Section 1 of the Sherman Act.

### iii. The NCAA's cap on compensation for prospective student-athletes does not promote competition.

The only way the NCAA has been able to enforce its remaining restraints on student-athlete compensation is the NCAA's ever-waning justification that its restraints are "pro-competitive." Even prior to the onset of the NIL era of collegiate sports, Justice Kavanaugh foreshadowed that the NCAA's pro-competitive justifications would not stand up to scrutiny under federal antitrust principles. *See NCAA v. Alston*, 141 S. Ct. 2141 (2021) (Kavanaugh, J., concurring). Justice Kavanaugh's warnings ring even truer, following the explosion of the collegiate NIL marketplace, and despite the NCAA's doomsday predictions in various court hearings and hearings before Congress, the business of collegiate athletics is stronger than ever.

One of the primary pro-competitive justifications that the NCAA has argued in prior cases is that if college athletes were paid it would hurt the appeal of their product. As stated in *O'Bannon*, the NCAA is committed to "preserving the popularity of the NCAA's product by promoting its current understanding of amateurism…" *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 1005 (N.D. Cal. 2014). However the current understanding of amateurism has changed dramatically in the time since the *O'Bannon* decision. The NCAA's interim NIL policy has ushered in the emergence of a billion dollar industry which provides compensation to student-athletes for the use of the their NIL. In light of these changes, the NCAA cannot make the same pro-competitive arguments regarding compensation from a decade ago.

Plaintiffs anticipate that under the current framework, Defendant may distinguish NIL compensation from compensation received from a team. In fact, current NCAA regulations and

13

many state statutes forbid NCAA member institutions from compensating student-athletes directly for their NIL pursuant to prohibitions of "pay-for-play." However, such payments are not at issue before this court, as OTE is not an NCAA member institution and does not compete in intercollegiate athletics. Any pro-competitive arguments regarding parity between collegiate programs have no relevance to this case. Further, the NCAA has expressly permitted other prospective student-athletes to receive NIL payments from OTE, without it affecting their eligibility. The NCAA properly certified Plaintiffs' former teammates. Plaintiffs only seek to receive the same consideration and treatment.

In the current landscape, prospective student-athletes have now been afforded the same opportunity to profit from their labor as prospective students with a talent for music, acting, or engineering. The NCAA's restriction on compensation for prospective student-athletes only serves to restrict access to collegiate athletics and the accompanying benefits it provides to an entire class of athletes, including Plaintiffs. This result does not promote competition and is thus unlawful under antitrust principles.

II. **Plaintiffs will be irreparably injured by the NCAA's declaration that Plaintiffs are ineligible to compete in collegiate athletics.**

Defendant's decision regarding Plaintiffs' eligibility will result in their exclusion from participating in intercollegiate athletics. This exclusion will result in the revocation of their athletic scholarships and the loss of all educational and economic benefits associated with their scholarships including but not limited to tuition, room and board, access to coaches, trainers, nutritionists, etc. Plaintiffs would also lose out on NIL opportunities associated with competing in intercollegiate athletics. Additionally, being declared ineligible and being banned from intercollegiate athletics will severely damage Plaintiffs' reputation within the sports industry and their eventual prospects to be drafted by an NBA team will be greatly diminished by their

96968\315051561.v2

absence from intercollegiate competition. As previous courts have noted, "[student-athletes] cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools." *In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1067 (N.D. Cal. 2019). The NCAA's actions seek to strip Plaintiffs of a once in a lifetime opportunity. A temporary restraining order and/or preliminary injunction are the only forms of recourse Plaintiffs have at their disposal that can completely eliminate this harm.[14]

### III. The balance of hardships favors Plaintiffs.

As noted above, Defendant's monopsony affords them unilateral power in determining the eligibility of prospective student-athletes. Defendant has the power to create and to invalidate its own rules with little oversight. Defendant's ability to wield this power to restrict compensation for student-athletes has been under attack at least since the complaint in *O'Bannon* was filed in 2009, if not before.[15] Yet, to date, Defendant has not created a permanent solution to incorporate its antiquated notions of amateurism into the reality of the modern industry of collegiate athletics. It only enacted its interim policy after judicial and legislative pressure, and provided little additional guidance on that policy. In that vacuum, the Plaintiffs entered into their respective agreements with OTE. Now, the NCAA seeks to permanently exclude Plaintiffs from collegiate athletics based on that contract despite having certified two athletes who entered into substantially similar NIL agreements. The injunctive relief sought will act to correct Defendant's

---

[14] In conjunction with the remedy sought by Plaintiffs, Chicago State University may pursue recourse through the Student-Athlete Reinstatement program offered by the NCAA. This pathway only became available to Chicago State following the issuance of the NCAA's decision on October 31, 2023. Because the NCAA did not open this pathway until less than one week before Plaintiffs' first game, Plaintiffs are forced to seek the present temporary restraining order in order to avoid missing games.

[15] *See Bloom v. NCAA*, 93 P.3d 621, 622 (Colo. App. 2004).

96968\315051561.v2

arbitrary decision against the Plaintiffs who stand to suffer irreparable harm if such injunction is not granted.  Therefore the balance of equities and hardships are in favor of Plaintiffs.

<u>**CONCLUSION**</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Honorable Court, pursuant to Fed. R. Civ. P. Rule 65, issue an immediate Temporary Restraining Order and Preliminary Injunction enjoining the Defendant from enforcing its decision regarding Plaintiffs' ineligibility and allowing Plaintiffs to participate in intercollegiate competition, and for all other relief the Court may deem proper and just.

Respectfully Submitted,

MATTHEW BEWLEY and RYAN BEWLEY

By: ___*/s/Dominique Price*___
     One of their Attorneys

Dominique A. Price
Daniel McGrath
Marcos Reilly
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, IL 60606
(312) 704-3000
Attorney No.: 6315143

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **November 1, 2023,** I electronically filed the forgoing  **BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** with the Clerk of the U.S. District Court, using the CM/ECF system reflecting service to be served upon all parties of record.

*/s/ Dominique Price*___
Dominique Price
One of the Attorneys for Plaintiff

16

96968\315051561.v2