**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW BEWLEY and RYAN BEWLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 1:23-cv-15570 |
| | ) | Hon. Robert W. Gettleman |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

# NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Patricia Brown Holmes
Brian O. Watson
Matthew A. Blumenreich
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
pholmes@rshc-law.com
bwatson@rshc-law.com
mblumenreich@rshc-law.com
docketdept@rshc-law.com

# TABLE OF CONTENTS

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. NCAA Prohibitions on Professional Arrangements ..... 2

II. Plaintiffs Chose to Play Professional Basketball ..... 5

III. NCAA's Certification Process for Amatuer Eligibility ..... 6

IV. NCAA's Available Administrative Remedies ..... 8

V. Plaintiffs' Inaccurate Comparisons ..... 9

LEGAL STANDARD ..... 10

ARGUMENT ..... 10

I. Plaintiffs Have Not Shown a Likelihood of Success on the Merits ..... 10

A. Plaintiffs Are Not Likely to Succeed on the Purported Illinois NIL Claim ..... 10

B. Plaintiffs Are Not Likely to Succeed on the Purported Unreasonable Restraint of Trade Claim ..... 11

C. Plaintiffs Are Not Likely to Succeed on the Purported Unlawful Group Boycott Claim ..... 13

II. Plaintiffs Have Failed to Establish That There Is No Adequate Remedy at Law ..... 13

III. Plaintiffs Have Failed to Satisfy Their Burden of Showing Irreparable Harm ..... 14

IV. The Balance of Hardships and Public Interest Does Not Favor Injunctive Relief ..... 14

V. Plaintiffs Have Failed to Exhaust Adminstrative Remedies ..... 15

CONCLUSION ..... 15

## INTRODUCTION

This case has nothing to do with name, image, and likeness ("NIL") or the Illinois Student-Athlete Endorsement Rights Act. The National Collegiate Athletic Association ("NCAA") Eligibility Center's initial eligibility decision for Plaintiffs Matthew and Ryan Bewley was "Final: Not Certified" because they entered into contracts to play professional basketball in the Overtime Elite League ("Overtime Elite") for large sums of money. The decision is hardly surprising, as a primary commitment of NCAA schools is to keep professional athletes out of college sport. Plaintiffs knew this fact when they entered into their professional contracts with Overtime Elite. NCAA rules—then and now—expressly state that an individual shall not be eligible to compete in a college sport if they enter into an agreement to play on a professional team in that sport for payment in excess of actual and necessary expenses.

Plaintiffs understood and accepted this risk when they entered into their professional contracts with Overtime Elite that promised to pay each hundreds of thousands of dollars to play in "a professional basketball league for elite-level high school age basketball players." Their agreements expressly stated that Plaintiffs risked "immediately los[ing] any and all eligibility to participate in . . . collegiate athletics of any form, nature or variety . . . including . . . the National Collegiate Athletics Association." But now that their eligibility has not been certified by the NCAA, Plaintiffs ask this Court to re-write the express terms of their contracts and grant them extraordinary injunctive relief. Plaintiffs' request should be denied.

As the Supreme Court has recognized, the NCAA plays a critical role in the maintenance of the non-professional ideal in college sport. The preservation of student-athletes adds richness and diversity to colleges. Thus, courts should take care when assessing the non-professional ideal, and should not blur the distinction between college and professional sports.

Plaintiffs attempt to turn their desired professional do-over into legal claims against the NCAA under the Illinois Student-Athlete Endorsement Rights Act, Section 1 of the Sherman Act for alleged unreasonable restraint of trade, and Section 1 of the Sherman Act for alleged group boycott. But Plaintiffs' motion shows no likelihood of success on the merits of these claims, let alone irreparable harm. Nor does the balance of hardships favor Plaintiffs, particularly where they contracted to lose their college eligibility in order to play professional basketball for pay.

Perhaps most critically, this is the wrong place, and the wrong process, for achieving the Plaintiffs' requested relief. Chicago State University ("Chicago State") is in the middle of the NCAA's administrative reinstatement process, which Chicago State began only after Plaintiffs filed this lawsuit. But the rules Plaintiffs challenge here were adopted by Chicago State and all other NCAA Division I schools, and to the extent Plaintiffs (and Chicago State) disagree with the rules, it is within the discretion of Chicago State and the other NCAA Division I schools to amend them under their process. To date, no such rule-change has been proposed or adopted.

As this Court's precedent makes clear, temporary restraining orders "are extraordinary and drastic remedies" that are appropriate only when the movant, "'by a clear showing, carries the burden of persuasion.'" *Elim Romanian Pentecostal Church v. Pritzker*, 613 F. Supp. 3d 1102, 1107 (N.D. Ill. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Plaintiffs fall far short of carrying this extraordinary burden as to each element, let alone all of them, for a temporary restraining order. The motion therefore should be denied.

## FACTUAL BACKGROUND

### I. NCAA Prohibitions on Professional Arrangements

The NCAA is a voluntary association created by member colleges and universities across the country to administer college athletics. The NCAA is led by its nearly 1,100 member

schools, including Chicago State. The participating colleges and universities competing in NCAA Division I adopted the NCAA Division I Manual ("Manual"), which defines the NCAA's purpose and sets out its fundamental policies and rules. The NCAA acts only where its member schools have delegated responsibility. For example, the Division I schools set rules governing amateurism, the recruitment of athletes, the rules of competition, and how postseason competition will work, and they delegated to the NCAA the power to enforce those rules. Declaration of Doug Healey ("Decl.") ¶¶ 5 & 33, Ex. O.

Chicago State and all other Division I schools are, and have been, committed to the principle of amateurism. Their Manual provides: "Member institutions shall conduct their athletics programs for students who choose to participate in intercollegiate athletics as a part of their educational experience and in accordance with NCAA bylaws, thus maintaining a line of demarcation between student-athletes who participate in the Collegiate Model and athletes competing in the professional model." Decl. ¶ 33, Ex. O at xii.

The Bylaws define a "professional athlete" as "one who receives any kind of payment, directly or indirectly, for athletics participation except as permitted by the governing legislation of the Association." *Id.* at DI Bylaw 12.02.11. In turn, the Bylaws also define a "professional team" as "any organized team that (a) provides any of its players more than actual and necessary expenses for participation on the team, except as otherwise permitted by NCAA legislation. Actual and necessary expenses are limited to the items listed in Bylaw 12.02.2,[1] provided the value of these items is commensurate with the fair market value in the locality of the player(s)

[1] Under NCAA Bylaw 12.02.2, student-athletes are limited to their actual and necessary expenses of (a) meals; (b) lodging; (c) apparel, equipment and supplies; (d) coaching and instruction; (e) health/medical insurance; (f) transportation; (g) medical treatment and physical therapy; (h) facility usage; (i) entry fees; and (j) other reasonable expenses. *Id.* at DI Bylaw 12.02.2.

and is not excessive in nature; or (b) declares itself to be professional." *Id.* at DI Bylaw 12.02.12.

As relevant here, the Bylaws provide that an individual "loses amateur status" and thus "shall not be eligible for intercollegiate competition in a particular sport if the individual":

(a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;

(b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;

(c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;

(d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;

(e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

(f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or

(g) Enters into an agreement with an agent.

*Id.* at DI Bylaw 12.1.2.

The Bylaws also provide that "[a]n individual shall not be eligible for intercollegiate athletics in a sport if the individual ever competed on a professional team (per Bylaw 12.02.12) in that sport." *Id.* at DI Bylaw 12.2.3.2. However, in "sports other than men's ice hockey and skiing, before initial full-time collegiate enrollment, an individual may compete on a professional team (per Bylaw 12.02.12), provided the individual does not receive more than actual and necessary expenses to participate on the team." *Id.* at DI Bylaw 12.2.3.2.1.

The Bylaws further set out that "[a]n individual shall be ineligible for participation in an intercollegiate sport if the individual has entered into any kind of agreement to compete in

professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement." *Id.* at DI Bylaw 12.2.5. However, in "sports other than men's ice hockey and skiing, before initial full-time collegiate enrollment, an individual may enter into an agreement to compete on a professional team (per Bylaw 12.02.12), provided the agreement does not guarantee or promise payment (at any time) in excess of actual and necessary expenses to participate on the team." *Id.* at DI Bylaw 12.2.5.1.

## II. Plaintiffs Chose to Play Professional Basketball

Before enrolling at Chicago State, Plaintiffs were admittedly paid professional basketball players in the professional league called Overtime Elite. Compl. ¶¶ 2–4. On May 19, 2021, Plaintiffs each signed professional-level contracts with Overtime Elite for a two-year term from July 1, 2021 to June 30, 2023 ("Contracts"). Healey Decl. ¶ 3, Exs. A and B at p. 29. Along with Plaintiffs, their parent-guardians signed the Contracts and identified a professional agent, Deandre Boynton. *Id.* Plaintiffs specifically agreed in the Contracts that they "may immediately lose any and all eligibility to participate in … collegiate athletics of any form, nature or variety, basketball or otherwise, including … the National Collegiate Athletics Association." *Id.* at ¶ 9.7.

The Contracts made clear that Overtime Elite had "established and operates the Overtime Elite League, *a professional basketball league* for elite-level high school age basketball players." *Id.* at p. 2 (emphasis added). Overtime Elite's website still confirms that, when the Contracts were signed in 2021, Overtime Elite "only offered *professional opportunities*." Decl. ¶ 4, Ex. C at p. 1 (emphasis added). In fall 2022, after Plaintiffs signed their Contracts, Overtime Elite then changed its professional model and "began offering athletes a scholarship option – instead of a salary – which provides unparalleled development and educational opportunities at [Overtime Elite] while preserving college eligibility." *Id.* Even still, Plaintiffs remained professionals.

The Contracts made Plaintiffs not only professional athletes but highly paid professional athletes. Under the Contracts, Plaintiffs each received salaries of $350,000 per year, $50,000 performance bonuses per year, and other financial benefits, including 20,493 shares of equity in Overtime Elite, apparel royalties, group licensing payments, housing, and meals. Decl. ¶ 3, Exs. A and B at ¶¶ 3.1(a); 3.1(b); 3.2; 3.3; 4.1(a); Ex. A (A-1). The Contracts also provided that "[d]uring the course and scope of employment, the Player shall perform work, duties and services at the direction of the Company and pursuant to the terms and conditions of the Agreement," none of which were NIL. *Id.* at ¶ 1.1(b).

Plaintiffs' choices violated the NCAA rules. As noted, Plaintiffs entered agreements to compete in professional athletics for a professional team with pay-for-play compensation—including substantial professional salaries, performance bonuses, shares of equity, apparel royalties, and group licensing payments—which went beyond their actual and necessary expenses. Plaintiffs thus understood and opted to lose their eligibility to play college sports in favor of professional sports. Decl. ¶ 33, Ex. O at DI Bylaw 12.1.2(a)–(e), 12.2.3.2, 12.2.5.

## III. NCAA's Certification Process for Amateur Eligibility

On June 22, 2023, Chicago State activated Plaintiffs on its 2023-2024 Institutional Request List, which is a list of student-athletes that an NCAA-member institution may be interested in recruiting. Decl. ¶ 6. The day after that submission, the Eligibility Center contacted Chicago State to set up an introductory call. Decl. ¶ 7. On June 27, 2023, the Eligibility Center conducted that call with Chicago State's compliance office. Decl. ¶ 8.

On June 28, 2023, Plaintiffs transitioned their NCAA Eligibility Center accounts from free profile accounts to academic and amateurism certification accounts. Decl. ¶ 9. Later that day, the Eligibility Center requested Plaintiffs' Contracts. *Id.* Rather than provide their Contracts, however, Plaintiffs' representative sent a letter dated June 29, 2023 to the Eligibility

Center about their Contracts. Decl. ¶ 10, Ex. D at p. 2. On July 24, 2023, almost a month after the initial request, the Eligibility Center finally received the Contracts from one of Plaintiffs' parents and, in turn, set up a call the next day with Chicago State. Decl. ¶ 11. The next day, the Eligibility Center sent questions to Plaintiffs about the agent identified in the Contracts, Mr. Boynton, and the number of games they had played for Overtime Elite. Decl. ¶ 12.

Nearly a month after the Eligibility Center sent these questions, on August 23, 2023, Plaintiffs submitted a memorandum about the number of games played and stated inconsistently that they had no agreements with Mr. Boynton. Decl. ¶ 13, Ex. E at pp. 2-3. Plaintiffs also stated inconsistently that "we did not receive compensation to practice or play with Overtime Elite. All compensation received under our Agreements . . . was for the complete sale and assignment of the players' NIL rights." *Id*. at p. 3. Two days later, the Eligibility Center spoke with Chicago State about Plaintiffs' inconsistent responses and raised concerns about their compensation and benefits received. Decl. ¶ 14. The Eligibility Center also emailed questions to Mr. Boynton and emailed Chicago State about the expenses and financial compensation that Plaintiffs had received. *Id*. On August 31, 2023, Plaintiffs represented to the Eligibility Center that they did not receive any apparel royalties or group licensing payments. Decl. ¶ 15.

On September 1, 2023, the Eligibility Center spoke with Overtime Elite about Plaintiffs' group licensing payments. Decl. ¶ 16. More than a month later, on September 21, 2023, Overtime Elite next confirmed that in addition their base salary, Plaintiffs *had received* a performance bonus, apparel royalties, and group licensing payments. Decl. ¶ 17. That information again contradicted Plaintiffs' statements. *Id.* The Eligibility Center contacted Chicago State on September 25, 2023 about this inconsistent information and told the institution that interpretative assistance was needed from the NCAA Academic and Membership Affairs

("AMA"). Decl. ¶¶ 18–19. The Eligibility Center then consulted AMA, which determined that Plaintiffs' group licensing payments with Overtime Elite were not permissible. Decl. ¶ 20. On October 6, 2023, the Eligibility Center relayed this information to Chicago State. Decl. ¶ 21. Then, on October 26, 2023, AMA determined that Plaintiffs' equity compensation was also impermissible. Decl. ¶ 22. The next day, the Eligibility Center discussed the administrative process with Plaintiffs' counsel. Decl. ¶ 23.

On October 31, 2023, the Eligibility Center posted the amateurism certification decisions as "Final: Not Certified" and an amateurism certification review summary ("Review Summary"). The Review Summary included factual determinations and found that "the prospective student-athlete entered into an agreement with a professional team that provided payment above actual and necessary expenses, as well as participated with a professional team," which violated NCAA Bylaws 12.1.2, 12.2.3.2, and 12.2.5. Decl. ¶ 24, Exs. F and G at p. 1. As a result of this detailed certification process, the Eligibility Center found Plaintiffs ineligible.

## IV. NCAA's Available Administrative Remedies

The NCAA's Review Summary also set forth the available administrative remedies for challenging the findings and/or legislative application:

> **Interpretation:** The institution may submit an "Interpretation Request" (via Requests/Self-Reports Online) to Academic and Membership Affairs regarding the legislative application.
>
> **Reconsideration:** The institution may request reconsideration of a final amateurism certification decision (via the Decision Inquiry Process) based on new relevant information (supported by contemporaneous documentation) that was not reasonably available to any involved individual at the time of the previous decision. Contact customer service to request a Decision Inquiry Form.
>
> **Fact-Finding:** The institution may request a factual determination by the applicable fact-finding committee for the division. The fact-finding request must be submitted within 30 calendar days after a final certification decision or written review summary (which occurs later) has been posted to the student-athlete's account. Contact the

> amateurism review team regarding the fact-finding process, which provides an avenue to resolve factual disagreements.
>
> **Student-Athlete Reinstatement:** The institution may submit a "Pre-enrollment Amateurism Certification Conditions (Student-Athlete Reinstatement)" request (via RSRO) to Academic and Membership Affairs to seek reinstatement of a prospective student-athlete who is not certified due to an amateurism violation. The institution may assert mitigation as part of the Student-Athlete Reinstatement request.

Decl. ¶ 25, Exs. F and G at pp. 2–3. None of these administrative remedies was pursued before this lawsuit was filed. Decl. ¶ 26. On November 7, 2023, Chicago State eventually submitted a request to the NCAA to seek reinstatement of Plaintiffs. *Id*.

## V. Plaintiffs' Inaccurate Comparisons

Plaintiffs speculate, without evidence, that two former Overtime Elite teammates are close comparators, Robert Dillingham ("Dillingham") and Kanaan Carlyle ("Carlyle"). Among other things, Plaintiffs speculate that Dillingham and Carlyle signed agreements with Overtime Elite "that provided for substantially similar education-related benefits and substantially similar NIL compensation as the agreement signed by Plaintiffs." Br. at 6. But Plaintiffs' Contracts and these other agreements are materially different.

In 2022, Dillingham and Carlyle executed an "Overtime Elite Financial Aid Agreement," which provides financial aid for "actual and necessary expenses," "educational related expenses," and permission to engage in "name, image, and likeness" opportunities. Decl. ¶¶ 27–28, Exs. H and J at ¶¶ 2–4. This agreement, unlike Plaintiffs' Contracts, provides no salaries, bouses, or other financial benefits including equity, apparel royalties, or group licensing payments, nor does it reach beyond "actual and necessary expenses." Moreover, the "Overtime Sports NIL Endorsement Agreement" executed by Dillingham and Carlyle provides that they are each an "independent contractor," unlike salaried "employees," such as Plaintiffs. Decl. ¶¶ 27–28, Exs. I and K at ¶ 11(a) *compare with* Decl. ¶ 3, Exs. A and B at ¶ 1.1.

Altogether, the record shows that the NCAA never delayed the certification process, Plaintiffs did not provide timely and accurate information to the Eligibility Center, Plaintiffs' Contracts are professional agreements that violate NCAA rules on their face, and the available administrative remedies still have not been exhausted.

**LEGAL STANDARD**

A temporary restraining order is designed to maintain the *status quo* until a hearing can be held on an application for preliminary injunction. *Abbott Labs v. Andrx Phams, Inc.*, 2005 WL 1273105, at *1 (N.D. Ill. May 20, 2005). The party seeking a temporary restraining order must show that it (1) has some likelihood of succeeding on the merits; (2) has no adequate remedy at law; and (3) will suffer irreparable harm if preliminary relief is denied. *OptionsCity Software, Inc. v. Baumann*, 2015 WL 3855622, at *3 (N.D. Ill. June 19, 2015) (citing *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). If these thresholds are met, the court then applies a "sliding scale" approach and weighs these considerations and the balance of harm to the parties and public interest. *See id*. Because temporary restraining orders "are extraordinary and drastic remedies," the movant bears the burden "'by a clear showing.'" *Pritzker*, 613 F. Supp. 3d at 1107 (quoting *Mazurek* 520 U.S. at 972).

**ARGUMENT**

**I. Plaintiffs Have Not Shown a Likelihood of Success on the Merits.**

**A. Plaintiffs Are Not Likely to Succeed on the Purported Illinois NIL Claim.**

Plaintiffs attempt to mask their dispute as a name, image, or likeness claim under 110 ILCS 190/15 ("Illinois NIL Statute"). The NIL Illinois Statute states in relevant part:

> Compensation from the use of a student-athlete's name, image, likeness, or voice may not affect the student athlete's scholarship eligibility, grant-in-aid, or other financial aid, awards or benefits, or the student-athlete's intercollegiate athletic ability. . . . Except as provided in this Act, . . . the [NCAA] shall not prevent, or otherwise

> enforce a contract, rule, regulation, standard, or other requirement that prevents a student-athlete at a postsecondary educational institution from earning compensation as a result of the use of the student-athlete's name, image, likeness, or voice.

110 ILCS 190/15(a)-(b).

In their Complaint, Plaintiffs speculate that the NCAA "seeks to exclude [Plaintiffs] from intercollegiate eligibility as a result of compensation [Plaintiffs] lawfully received in exchange for the use of their name, image, and likeness prior to enrolling in an NCAA member institution." Compl. ¶ 71. Plaintiffs' motion similarly focuses on the NIL aspects of the Contracts—without regard to the professional status that led to Plaintiffs' ineligibility—to assert that "the NCAA cannot hide behind labels to disguise reality." Br. at 9.

Plaintiffs' NIL arguments miss the mark entirely. Plaintiffs are not "student-athletes" covered under Illinois NIL Statute. 110 ILCS 190/5 ("'Student-athlete' means a student currently enrolled at a postsecondary educational institution who engages in, is eligible to engage in, or may be eligible in the future to engage in, an intercollegiate athletics program at a postsecondary educational institution. If an individual is permanently ineligible to participate in a particular intercollegiate sport, the individual is not a student-athlete for purposes of that sport.").

Additionally, the NCAA did not find Plaintiffs ineligible because of NIL compensation. Plaintiffs admittedly played professional basketball in a professional league under professional contracts with professional compensation far above actual and necessary expenses—including substantial salaries, performance bonuses, equity, and other financial benefits. That professional compensation had *nothing* to do with NIL. Accordingly, Plaintiffs do not have a likelihood of success on the merits for their NIL claim.

### B. Plaintiffs Are Not Likely to Succeed on the Purported Unreasonable Restraint of Trade Claim.

Plaintiffs also allege, without evidence, that the NCAA limits of "actual and necessary

expenses to participate" on a professional team under NCAA Bylaw 12.2.3.2.1 violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Br. at 10. To support their alleged Sherman Act violation for unreasonable restraint of trade, Plaintiffs must establish "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint on trade in the relevant market; and (3) and an accompanying injury." *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 893 (N.D. Ill. 2009) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)).

Plaintiffs offer no such evidence. Moreover, contrary to Plaintiffs' suggestion, the Supreme Court has not backed away from its longstanding view that the NCAA plays a "critical role" in ensuring that professional athletes do not play college sport, and courts "should take care when assessing the NCAA's restraints on student-athlete compensation." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 120 (1984); *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2158 (2021). The NCAA "needs ample latitude to play that role," and its "preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics *and is entirely consistent with the goals of the Sherman Act*." *Bd. of Regents*, 468 U.S. at 120 (emphasis added). While *Alston* recently rejected the idea "that courts must reflexively reject *all* challenges to the NCAA's compensation restrictions," it concurred in *Board of Regents*' long-standing respect for the non-professional ideal. *Alston*, 141 S.Ct. at 2158.

*Alston* rejected the proposition that, in the antitrust arena, *Board of Regents'* "ample latitude" somehow "foreclose[s] any rule of reason review" of NCAA rules. *Alston*, 141 S.Ct. at 2157-58. But it also acknowledged that *Board of Regents* "may suggest that courts should take care" when conducting such review and praised "not blur[ring] the distinction between college and professional sports." *Id.* at 2158, 2164. Thus, the line of precedent cited by Plaintiffs and culminating in *Alston* makes clear that the non-professional ideal still merits "ample latitude" or

"care" from courts, *Board of Regents*, 468 U.S. at 120, and that requires an "exhaustive factual record, a thoughtful legal analysis consistent with established antitrust principles." *Alston*, 141 S.Ct. at 2166. Plaintiffs' request does the opposite and departs from the framework they cite that courts should "not blur the distinction between college and professional sports." *Id.* at 2164.

### C. Plaintiffs Are Not Likely to Succeed on the Purported Unlawful Group Boycott Claim.

Plaintiffs also attempt to raise an unlawful group boycott claim under Section 1 of the Sherman Act, 15 U.S.C. § 1. To support their alleged boycott claim, Plaintiffs must show: "(1) at least some of the boycotters were competitors of each other and the target, and (2) the boycott was designed to protect the boycotters from competition with the target." *Cathedral Trading, LLC v. Chicago Bd. Options Exch.*, 199 F. Supp. 2d 851, 859 (N. D. Ill. 2002).

Again, Plaintiffs make no such showing on their claim. Nor do the Plaintiffs' arguments overcome their cited own case law that the NCAA plays a critical role in the maintenance of the non-professional ideal in college sports, and that antitrust theories against the NCAA should "not blur the distinction between college and professional sports." *Alston*, 141 S.Ct. at 2164; *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1258 (9th Cir. 2020) (refusing under antitrust law to permit college student athletes to be treated like professionals when it declined to allow them to receive "unlimited payments unrelated to education, akin to salaries seen in professional sports leagues").

## II. Plaintiffs Have Failed to Establish That There Is No Adequate Remedy at Law.

Plaintiffs' motion also fails to show the absence of an adequate remedy at law. Their allegations fall short because merely "implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). If permitted, Plaintiffs would have the same amount of eligibility

to play, and they have not shown or argued "that an award of money damages will not be adequate." *Health o Meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160, 1175 (N.D. Ill. 1995).

**III. Plaintiffs Have Failed to Satisfy Their Burden of Showing Irreparable Harm.**

Nor have Plaintiffs carried their burden that they will suffer irreparable harm. To establish irreparable harm, they must show "that irreparable injury is *likely* in the absence of an injunction." *Woodard v. Victory Records, Inc.*, 2013 WL 5517926, at *3 (N.D. Ill. Oct. 4, 2013). Plaintiffs "*must present some evidence* from which the Court can draw a reasonable inference that they are likely to suffer irreparable harm before final judgment." *In re Clearview AI, Inc. Consumer Privacy Litig.*, 2021 WL 5862497, at *2 (N.D. Ill. June 14, 2021) (emphasis added).

Plaintiffs have not done so; they instead assert, without evidence, that they will suffer irreparable harm because of their ineligibility. Br. at 14-15. They speculate that their scholarships will be revoked, they will lose "all educational and economic benefits associated with their scholarships," and they will miss "NIL opportunities associated with competing in intercollegiate athletics." *Id.* at 14. But Plaintiffs offer no evidence to support their speculation, and, again, if allowed, they still would have the same amount of eligibility to play. Thus, Plaintiffs have not shown likely and imminent irreparable injury. *Stroman Realty, Inc. v.* Martinez, 505 F.3d 658, 664 (7th Cir. 2007) ("[S]peculation does not rise to the level of irreparable harm that would justify the intervention of a federal court."); *Saukstelis v. City of Chicago*, 1990 WL 146711, at *8 (N.D. Ill. Oct. 3, 1990) (denying preliminary injunction when there is an "absence of proof supporting movants' assertions of imminent irreparable harm").

**IV. The Balance of Hardships and Public Interest Does Not Favor Injunctive Relief.**

Because Plaintiffs do not have a strong likelihood of success on the merits and they have failed to satisfy their burden of showing irreparable harm, balancing of harms also favors the NCAA. Courts apply "the 'sliding scale' approach: the more likely it is the plaintiff will succeed

on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs*, 971 F.2d at 12. While Plaintiffs generally complain about the NCAA's interim NIL Policy, Br. at 15, their complaints are misplaced as explained above, and Plaintiffs—not the NCAA—delayed the eligibility process with their untimely and inaccurate information.

## V. Plaintiffs Have Failed to Exhaust Administrative Remedies.

Finally, Plaintiffs' request for injunctive relief should be denied as premature for failure to exhaust administrative remedies. "It is not within the province of the court to short circuit the administrative process when as here that process is fully capable of remedying the wrong alleged." *Dunsworth v. Lane*, 1988 WL 56181, at *3 (N.D. Ill. May 23, 1988) (denying temporary restraining order for failure to exhaust administrative remedies); *see also N.S. by and through Meg S. v. Bd. of Ed. of City of Chicago*, 2019 WL 4166871, at *2 (N.D. Ill. Sept. 3, 2019) (denying injunctive relief when the plaintiff "failed to exhaust his administrative remedies prior to filing"); *Baca-Prieto v. I.N.S.*, 1992 WL 245550, at *4 (N.D. Ill. Sept. 18, 1992) (same).

As explained above, Plaintiffs and their NCAA-member institution, Chicago State, are still in the NCAA's administrative reinstatement process, which Chicago State began only after this lawsuit. Decl. ¶ 26. To the extent Plaintiffs (and Chicago State) disagree with the eligibility rules, any disagreement or proposed change falls to the discretion of Chicago State and all other NCAA Division I schools that have adopted them. Plaintiffs' motion is thus premature.

## CONCLUSION

For these reasons, the NCAA requests that the Court deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and grant the NCAA any other relief that the Court deems just and proper.

Dated: November 13, 2023

Respectfully submitted,

*/s/ Patricia Brown Holmes*
Patricia Brown Holmes
Brian O. Watson
Matthew A. Blumenreich
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
pholmes@rshc-law.com
bwatson@rshc-law.com
mblumenreich@rshc-law.com
docketdept@rshc-law.com

*Attorneys for National Collegiate Athletic Association*