UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MATTHEW BEWLEY and )
RYAN BEWLEY, )
                      )
        Plaintiffs, )
                      )
      vs. ) No. 23 C 15570
                      )
THE NATIONAL COLLEGIATE )
ATHLETIC ASSOCIATION, ) Chicago, Illinois
                      ) November 14, 2023
        Defendant. ) 9:47 a.m.

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiffs:       HINSHAW & CULBERTSON LLP
                      BY:  MR. DOMINIQUE A. PRICE
                           MR. MARCOS REILLY
                      151 North Franklin Street, Suite 2500
                      Chicago, Illinois  60606
                      (312) 704-3000

For the Defendant:       RILEY SAFER HOLMES & CANCILA LLP
                      BY:  MR. BRIAN O'CONNOR WATSON
                           MS. PATRICIA BROWN HOLMES
                           MR. MATTHEW A. BLUMENREICH
                      70 West Madison Street, Suite 2900
                      Chicago, Illinois  60602
                      (312) 471-8700

Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                      219 South Dearborn Street, Room 1706
                      Chicago, Illinois 60604
                      (312) 435-7626
                      *nancy_bistany@ilnd.uscourts.gov*

(Proceedings heard in open court:)

THE CLERK: 23 C 15570, Matthew Bewley versus The National Collegiate Athletic Association.

If counsel will step forward.

MR. PRICE: Dominique Price here on behalf of plaintiffs Matthew and Ryan Bewley, and this is my colleague.

MR. REILLY: Marcos Reilly on behalf of plaintiffs as well.

MS. BROWN: Good morning, Judge.

Patricia Brown Holmes on behalf of the NCAA.

MR. BLUMENREICH: Good morning, Your Honor.

Matthew Blumenreich on behalf of the defendant, NCAA.

MR. WATSON: Good morning, Your Honor.

Brian Watson on defendant of defendant NCAA.

THE COURT: Okay. This is here on a motion for a temporary restraining order.

There was also a motion by the defendant to file certain exhibits, which I can't even lift, so I obviously haven't had a chance to read. But I have read the brief that you filed and some of the exhibits. But we'll grant that motion just as we did for the plaintiff.

So there's a motion for a TRO and a preliminary. I guess I'll hear from the plaintiff first.

MR. PRICE: Yes. Good morning, Judge.

As you mentioned, we are here on behalf of plaintiffs

Matthew and Ryan Bewley seeking a TRO pursuant to the Federal Rule of Civil Procedure 65.

Just as a little housekeeping matter, we previously scheduled this hearing for last week, and it was moved to this week. And that was not a matter of whether this was an emergency or not. We had communications with defendant's counsel and with the defendant's client seeking the administrative remedy through reinstatement.

There were some assurances that that process could be moved forward expeditiously, and the hope was that that would be completed prior to this hearing.

As of today's date, we have not received a ruling on the reinstatement, so we have decided to proceed forward with the motion for the TRO.

Since filing this complaint, there have been three games that Chicago State has played, and my clients have not been able to play in those games. And they actually have a game tonight. So that harm of missing those games, missing the opportunity to compete in collegiate athletics has continued since the filing of the complaint.

Based on the TRO, we want to show a couple of things; first, that there has been irreparable harm. By not being able to participate in college athletics, my clients are missing out on a lot of opportunities. If they are permanently banned, as the NCAA proposes to do, they would lose their scholarships.

They would lose all the academic benefits that come with being a scholarship athlete at a university, including the educational benefits, tutoring, training, nutrition, all of the gambit of benefits that are wrapped into being a collegiate athlete on scholarship.

They would also lose the ability to compete at the highest level of basketball. There are a number of cases throughout that have shown that competing at the highest level with the NCAA is the most direct and the most productive route to become a professional athlete, and they will be deprived of that opportunity.

They would also lose access to NIL compensation that comes with competing as a collegiate athlete. Based on the NCAA's interim policy, collegiate athletes are able to profit from their name, image, and likeness. And the inability to compete for a college would remove those opportunities.

They would also suffer damage to their reputation. Student athletes who are found to be in violation of NCAA bylaws often suffer a stigma as seen as cheaters or people that aren't able to follow the rules.

Finally, they will receive irreparable harm to their draft stock. So, again, the inability to compete at the highest level, to have to sit out and not complete at the collegiate level will hurt their eventual ability to play in the professional ranks of basketball, whether that be in the

NBA or otherwise.

There have been a number of cases, including ones before this particular court. One of your former colleagues in *Ganden versus the NCAA* showed in that case or ruled in that case that the inability to compete for a swimmer caused irreparable harm and that that harm, there was no adequate remedy at law.

Playing a collegiate athlete -- playing collegiate athletics, as I did myself, is a once-in-a-lifetime opportunity. And once that opportunity is taken away, there's no way to get back from that. And follow-up cases that have followed your former colleague's decision in *Ganden v. NCAA* and *Hall v. University of Minnesota* have agreed with that decision; that excluding student athletes from that, from that opportunity causes irreparable harm.

Secondly, the balance of hardships favors the plaintiffs in this case.

THE COURT: Let me stop you. Why don't we talk about these issues separately.

How does the defendant respond to that, to the irreparable harm, lack of a remedy at law issue?

MR. WATSON: Your Honor, the defendant disputes that there is irreparable harm here, first, because if the plaintiffs are ultimately successful in obtaining eligibility, the plaintiffs would have the same amount of eligibility to

play college sport. There is no rush here to obtain immediate eligibility because the same amount of time and play man -- playing would inure to the plaintiffs' benefit if they are successful on the merits.

THE COURT: They are saying the games are being played as we speak almost and that they could lose their scholarship and basically be out of college as a result of that.

MR. WATSON: They are saying that. There is no evidence of that. The Court has not seen the scholarship or financial package from Chicago State saying Chicago State will eliminate your scholarship or that Chicago State will not provide you your education. There has been zero, zero showing of that harm.

THE COURT: Let me ask counsel. What do you say about that? Do we need to have some sort of evidentiary hearing about what the arrangement is with Chicago State?

MR. PRICE: I personally don't think that's necessary. They are on athletic scholarship. Athletic scholarships are limited by number for a program. Programs, especially a basketball team with limited numbers, cannot hold on to scholarships for players that are not actively playing.

THE COURT: But don't we need something to reach that conclusion, at least, you know, whatever -- whatever arrangement they have with the school, something to show what

that arrangement is?

In other words, if they had gotten scholarships, does it say it's dependent upon them being able to play? That's what you're suggesting, obviously.

MR. PRICE: Sure, sure.

THE COURT: And I think that's -- you know, that's a logical inference, but it's just an inference. Inferences have to be based on evidence, obviously.

MR. PRICE: Sure. And we've worked lockstep with Chicago State so we can obtain that information, but that is one of several types of irreparable harm that would come to the plaintiffs.

THE COURT: That's a big one.

MR. PRICE: Absolutely.

THE COURT: Not being able to play a game, I could see where you could say that's irreparable harm. You can't go back and play it once it's been played.

But the more important damages would be if they were to lose their educational opportunities. I agree if they were to lose their educational opportunities, that's a pretty strong argument for irreparable harm.

But as counsel said, I think we need more than just the inference that you're asking me to draw.

Okay. Let's put that aside. Very frankly, I think the most important issue we have to address today is likelihood

of success, because that goes back to the actual contracts that we do have in evidence at this point that you submitted -- that both sides have submitted. So why don't we talk about that first.

MR. PRICE: Sure. And just to go back on one issue that marries to this, the determination of whether there's irreparable harm obviously works on the sliding scale to determine what's the burden of proof on the likelihood of success.

Based on our interpretation of what the irreparable harm is and the prior cases that have decided on this issue, that we only need to show a moderate likelihood of success based on the harm.

THE COURT: Well, okay. Even if I were to find that there would be irreparable harm here, I would still have to find that there is a likelihood of success. And the strength of that finding -- you're right, a sliding scale that the Seventh Circuit has given us to consider would come into play at that point.

But I think the first thing you have to do is say, do you have a likelihood of success? And if you do, how strong is it to issue something as extraordinary as a TRO or a preliminary injunction?

I don't think we're even at the preliminary injunction stage here. Obviously, there's been no evidentiary

hearing or anything like that or depositions or anything else. So I want to talk about that.

I also want to ask a couple of questions, because I'm not a big basketball fan. I hate to tell you that, but I don't follow college sports particularly, so a lot of this is kind of interesting and new to me.

But you mentioned that there is some sort of -- well, you mentioned two things that I'm curious about. One is the administrative proceeding that you say has not been exhausted at this point; and secondly, that Chicago State is in some sort of flux or I'm not sure exactly what to call it. There's some sort of proceeding going right now.

So maybe the defense can explain that to me.

MR. WATSON: Yes, Your Honor.

THE COURT: You raised it.

MR. WATSON: We did -- we did raise it.

Counsel is correct that we postponed the initial hearing pending an administrative process. The administrative process for an eligibility has several steps for both the plaintiffs and Chicago State to exhaust remedies.

The NCAA's eligibility center makes findings and then applies it to the bylaw. Those findings are factual. Those are submitted inside of our briefs.

And what the Court can see is that -- this is the declaration Exhibit F -- the NCAA makes findings as to an issue

here, that the prospective student athlete entered an agreement with a professional team and provided payment, applies it to these bylaws, and then has a step for the NCAA to hear a dispute about those findings and application to the bylaw.

THE COURT: Can I just interrupt you for a second?

(Discussion off the record.)

MR. WATSON: This is declaration Exhibit F, which is the eligibility center's document posted for Chicago State on the ineligibility process.

When the NCAA makes its findings of fact based on the record and applies it to the bylaws, there are several administrative steps that both the prospective student athlete and the member institution, the member of the NCAA can take.

I'm going to jump to the Court's first question of what has actually occurred.

Chicago State submitted a student athlete reinstatement request. That reinstatement request asks the NCAA as a member institution to reconsider the application of those findings, those factual findings, to the bylaws. And that goes to a committee at the NCAA to review.

This is a member-led organization, Judge. These are bylaws created and passed by its membership. This administrative step is the natural result of allowing Chicago State to contest the eligibility finding inside of its very own membership.

That finding then goes inside of the administrative process to a review where you can also take an appellate review inside of the membership to contest whether the plaintiffs here are eligible.

Again, Your Honor, it is a member-led institution with member-created rules with a member right to contest those rules, with a member right to contest the factual findings and to attempt to change the eligibility findings.

That process has not yet been completed. The Chicago State University, in fact, requested student athlete reinstatement after the lawsuit was filed. There's no evidence of why Chicago State waited until after the lawsuit was filed to submit that reinstatement request.

But importantly, as you see in this document that's in front of you, there's a lay of the land of next steps. You can contest the interpretation whether the bylaws were properly interpreted.

You can contest the factual finding. So, for example, did those contracts say what they said? Did somebody, in fact, have payment? Did somebody, in fact, enter into a contract? These are factual findings that are disputed inside of the administrative process of the NCAA so that the members of the NCAA and its prospective student athletes have the ability to administratively resolve factual disputes.

You can then take those factual disputes and appeal

them to an administrative committee and have that committee apply those facts to the bylaws and determine whether it's the right outcome.

That is a process that could have occurred, particularly by the plaintiffs here, and they didn't do it.

Separately, as I mentioned, Chicago State has sought the administrative remedy of reinstatement. That process has not yet completed. It is still underway. Could the outcome be to find plaintiffs eligible or to keep them as ineligible? As I sit here, stand here, I don't know.

THE COURT: Where is that process?

MR. WATSON: That process is occurring inside of the NCAA right now.

THE COURT: No. I mean, is it at the appellate stage or at the preliminary stage?

MR. WATSON: Preliminary stage at staff.

The second question that the Court had about why is this important for a member institution to be in flux inside of this process? It's because these rules are created by the member. So if a member has a dispute with the rules that were applied here, the member can contest it.

If the member wants to change the rule, the member can propose through the administrative process to change the rules, which then goes through, as you can imagine with an association, a review process, a process to consider whether

the association agrees with the change in the rule, and ultimately up to the board of governors to decide whether a rule change is needed.

THE COURT: Has that been initiated?

MR. WATSON: Chicago State has not requested a rule change.

So we have a dispute here that's premature. Number one, the Bewleys did not and have not requested administrative review.

Second, Chicago State is in the midst of administrative review.

Third, Chicago State has not proposed a change to the rule that is contested here.

You may actually ask why is Chicago State not a defendant in this attempted injunctive relief?

THE COURT: Well, I have in my list of questions, why aren't they part of this case?

Well, you know, whether they are a defendant or not, they obviously have an interest in the case.

MR. WATSON: And --

THE COURT: And they may seek to intervene. I don't know whether or not there's been any talk about that or not, but it seems to me they're here whether --

MR. PRICE: Yes.

THE COURT: Whether they're actually here or not,

they're here.

MR. WATSON: And the Court's questions have gone to, will you lose financial aid? Will you not play? Will you not get an education? Those are questions properly put to Chicago State.

So if we're asking about instituting an injunction against an institution who is made up of its members, that injunction is missing the key component. It shouldn't be granted. But it's missing the key component of why isn't the member institution a party?

MR. PRICE: If I can answer that.

THE COURT: Well, there's a lot of things to answer there.

MR. PRICE: Sure.

THE COURT: Anything else to say on these issues -- on that issue?

MR. WATSON: On that issue, I know the Court started with the keystone here is likelihood of success, and I would like to address that at some point.

THE COURT: We'll get --

MR. WATSON: But on that issue, Your Honor, that's the point I wanted to make.

THE COURT: We'll get to that.

Okay. Counsel.

MR. PRICE: We worked lockstep with Chicago State

from the beginning of the lawsuit. The reason we're here before you now and the reason that we're suing the NCAA as a defendant is because time is of the essence in this.

There are -- there's a game tonight. They have already missed three games. The Bewleys started the administrative process in June, and it took them four months to reach the conclusion on initial certification.

They don't have another four months to wait for the NCAA to move. That's why we filed the lawsuit, because time is of the essence. The irreparable harm has already started, and it continues even today. So we were seeking the TRO to get immediate relief and to allow them to play.

Now, again, as I mentioned, we've spoken with defendant's counsel. We have spoken with people at the NCAA, and that was the entire purpose of why this meet -- this hearing was moved to today.

We wanted to get that administrative process going, get a -- get some relief through that administrative process. And, again, we can't control how fast they move. They move slow sometimes. But our clients are injured. The slower they move, the more games they miss, the less opportunity they have.

And to speak on the likelihood of success --

THE COURT: Let's stop there for a moment.

MR. PRICE: Sure.

THE COURT: In their response brief, they say this --

what you call a delay was basically the product of a give-and-take or requests back and forth between the parties that didn't really reach a conclusion until more recently.

So, I mean, that's, I guess, a contested issue. I don't know, but it's at least an explanation for the timing of this thing.

MR. WATSON: It's an explanation for the timing. You are right that there was a back-and-forth of a request for the contracts. There was a request for the status --

THE COURT: When did you see the contracts first?

MR. WATSON: We first saw the --

THE COURT: I know it's in your brief. I just don't remember.

MR. WATSON: -- the contracts in -- I will check that, Your Honor.

The contracts gave rise to a number of questions, including whether there was an agent, whether there was payments, the benefits of the plaintiffs under those contracts.

Each of those questions required a factual finding. As the Court is right, there was inconsistent information given during that factual finding. The NCAA did not delay in its findings or in its investigation. And ultimately, Your Honor, if there was a dispute about the ineligibility finding, Chicago State could have submitted its reinstatement requests as soon as possible.

So the notion that the NCAA delayed or we're here because of the NCAA's delay is untrue. Chicago State as a member institution of the NCAA had the ability to ask for and seek reinstatement as soon as it saw this eligibility findings.

THE COURT: Excuse me one second.

MR. WATSON: And, Your Honor --

THE COURT: One second.

(Brief pause.)

THE COURT: I have a lot of papers up here, and I think I left the response brief on my desk in chambers. So I just want to get it, because that did have the date on it.

MR. WATSON: July 24th, 2023, Your Honor.

THE COURT: Okay.

MR. WATSON: So the notion that it's the NCAA's delay that brings us here today, it is not. It was the back-and-forth between the plaintiffs and the NCAA. It was the lack of information given. It was the inconsistent information. It was the investigation. It was ultimately factual findings and an administrative process that applied those factual findings to bylaws.

Again, before this lawsuit got filed, before we had our first notice of a TRO hearing, before today, Chicago State could have submitted its reinstatement request, started the process immediately if there was a dispute about the application or the facts.

THE COURT: When did they actually do that? You say that's in the process right now. When did they do that?

MR. WATSON: Chicago State submitted its request for reinstatement, I believe, last week, Tuesday.

MR. PRICE: Tuesday, November 7. So less than a week after the certification decision came down.

MR. WATSON: They requested expedited review. The NCAA is expediting its review. And then the rights of the member institution for appellate review inside of the administrative process will inure to the member institution.

THE COURT: Okay.

MR. WATSON: The cited case law, Your Honor, is clear. No TRO should be issued if there's a failure to exhaust administrative remedies. We've cited the case law for that. There's a good reason for that, and those cases all explain why.

THE COURT: All right. Let's talk about likelihood of success. Why don't you go.

MR. PRICE: Sure. And it touches on a couple of points that counsel brought up, that Chicago State could have asked for a rule change.

We, as far as our state law claim is concerned, don't require a rule change in order to deem the plaintiffs eligible. We only request that the defendant treat the plaintiffs equally, fairly, and in reading their bylaws as they stand.

It's undisputed under NCAA bylaws that a prospective student athlete is permitted to participate on a professional team. So you will hear a lot from counsel about whether this was a professional contract or not, whether this was a professional league.

All of those arguments are irrelevant, because the bylaws specifically allow that. And I'll read the section.

NCAA Bylaw 12.2.3.2.1: In sports other than men's ice hockey and skiing, before initial full-time collegiate enrollment, an individual may compete on a professional team provided the individual does not receive more than actual and necessary expenses to participate on the team.

So whether the contract -- we would dispute some of the reasoning and some of the logic the NCAA applies to determine that it was a professional league for my clients, an amateur league for others, that it was a professional league for one year, and an amateur league in another year without any operational changes. We dispute some of that.

But for purposes of this argument, it doesn't matter, because prospective student athletes are permitted to sign those contracts. The only issue is the compensation they received. And the defendants argue that that compensation was in excess of actual necessary expenses.

We argue that those -- that compensation is for name, image, and likeness, which is expressly permitted under the

NCAA's interim policy. And if you have a look at the contract, the language is right there in black and white.

Defendant's brief makes the bold claim that this has nothing to do with NIL. But if you look at our Exhibit C, which is the contract that my clients signed, and you go to page 14 and you go to page 15 and 16, 17, 18, and 19, all deal with use of name and likeness and other intellectual property.

The compensation they received to participate on this team was related to their name, image, and likeness. Overtime Elite, I don't -- you said you're not a basketball fan, so you might not be familiar. They have a reality TV show that's on Amazon Prime. It's a big driver of revenue for this team.

So the name, image, and likeness of my clients was a primary driver in this contract and takes up five pages of the contract. For the defendant to say that it has nothing to do with NIL, that there's no NIL here is disingenuous, at best.

And then if you look at the contract that they deem acceptable, there are other athletes that played on the same team as my clients, that played in the same games as my clients, lived in the dorms, ate dinner, received compensation from the same team. They have deemed these players eligible. And in that contract, it determines what this NIL is worth.

There was a change to the contract. My clients were the first to sign to this team. They signed what we'll call version 1.0. Version 2.0, which the NCAA has certified

athletes that signed that version, has name, image, likeness deals in it of the same values of the compensation that my clients received.

So there's a lot to be said about how much money they made and whether they're professionals based on how much money they made. But all of that is irrelevant, because there are currently collegiate athletes that have been certified by the defendant that made the same amount.

They -- the defendant simply relies on the first page of the contract and doesn't go any further to say that they received a salary, but they don't look at what the compensation and what the consideration -- consideration was for that compensation.

So the state law specifically prohibits a student athlete from being deemed ineligible based on compensation they received based on their name, image, likeness.

Now, that begs the question: What exactly does a name, image, likeness contract look like?

There's no guidance from the NCAA about what terms may or may not be in this contract. This is a contract that involves high school athletes at a high school. It's not an NCAA institution. They don't have the power to regulate what's in these contracts. They deferred that to the states in their interim policy.

So based on the state law, based on their own bylaws,

a student athlete has the undisputed right to sign a contract with a professional team. They also have the undisputed right to exercise and be compensated for their name, image, likeness.

That is the two things that my clients did. When you read those bylaws in conjunction, it's clear that the NCAA bylaws have not been violated by my clients. And for that reason, the injunction should be in place.

MR. WATSON: May I, Your Honor?

THE COURT: Your turn.

MR. WATSON: We heard no mention of likelihood of success on the legal claim antitrust, so I won't address those --

THE COURT: I think that -- from what I take by reading your pleadings for the plaintiffs, you are really seeking a TRO on the state law, aren't you?

MR. PRICE: Yes. And there's a reason for that. If we were to get a TRO based on the antitrust law, it is in contrast to the NCAA bylaws. They may then go after Chicago State if that TRO is overturned.

So we want to first show that my clients have lived up to and followed the bylaws as written and that they should be eligible based on that fact alone.

THE COURT: Under the state law?

MR. PRICE: Yes, correct.

THE COURT: Right. And the antitrust issues are much

more complicated and probably deserve a lot more discovery and other proceedings than we will get into today.

Okay. Your turn.

MR. WATSON: As does the NIL claim, Your Honor. And I heard a number of suggestions that the NCAA didn't look beyond page 1 and didn't look at the substance of the contracts. And we can walk through in detail why that is not true.

Before you you have Exhibits A and B to the declaration we submitted. And let's walk through with the Court the terms of the contract that are material to plaintiffs' claim.

As plaintiffs' counsel suggested, page 1 of the contract that the Bewleys signed with their parents makes clear that the company has established and operates a professional league, and the players wish to be engaged by the company to play in the league.

Judge, this is an extraordinarily material point. Page 23, section 9.7 of the contract, the plaintiffs agreed to eligibility loss. The player understands, acknowledges, and agrees the player may immediately lose any and all eligibility to participate in NCAA events. That is a knowing, understanding, acknowledgment, and agreement of the loss of eligibility.

There was a suggestion that these are only name,

image, and likeness agreements. Again, the contract contradicts the argument. The plaintiffs had professional duties under their own contracts.

Page 6, section 1.1: By signing this agreement, the player acknowledges and agrees that the player is an employee of the company. During the course and scope of the employment, the player shall perform work, duties, and services at the direction of the company.

It goes on in the contract to explain the work, duties, and services; professional work, duty, and services.

Attendance and participation in league orientation, training camp, playing in the league, exhibition, preseason, regular season, playoff, tournament, post-season, invited to the league's all-star game, competition or every event, promotional and commercial activities, performance of other services and responsibilities reasonably requested by the company, these are professional work duties.

There was a suggestion that we ignored everything beyond page 1. We looked at what the professional duties were, and they are outlined here. They are not limited to name, image, and likeness. They are far exceeding name, image, and likeness. These are professional duties.

The contract had professional benefits. As mentioned, the plaintiffs were employees of a professional league. The player will be eligible to elect to participate in

the company's employee benefit plans and programs established for league players. That's page 13, section 4.2. Those are professional benefits.

The players had professional salaries. This is page 11, section 3.1: For all the services performed by player during the term -- and we walked through what those services were, the professional work obligations of a professional player -- the company shall pay the player the base salary. And then it identifies in the exhibit a base salary of $350,000 per year for two years, not tied to name, image, and likeness but tied to the services that a professional was playing under their professional work duties.

The plaintiffs had professional bonuses. Again, player will be eligible for a discretionary performance bonus as set forth on Exhibit A. And it identifies a performance bonus on top of the salary of $50,000, again, tied to the performance of the plaintiffs in a professional league under professional services, not name, image, and likeness.

The plaintiffs had professional equity bargained for and agreed in their professional contracts. Section 3.2 on page 12: Subject to the approval of the board and its compensation committee, player will be granted an option under the company's 2018 stock option plan to purchase shares of the company's common stock. And it identifies the number of shares on the exhibit, not tied to name, image, and likeness, tied to

the professional compensation package.

Overtime Elite created in its 2021 program, and they offered professional opportunities.  This is still held out as a professional league.  The plaintiffs signed on and contracted to a professional league.

This isn't form -- this isn't form over substance.  This is the substance of the evidence that we cannot put aside at this stage of the proceeding.

Overtime Elite, as mentioned, is the professional league that the plaintiffs played for.  And if we hear from Overtime Elite and its own managing director, he says the following:

(Video recording played in open court.)

THE COURT:  Better start that one again.

MR. WATSON:  Yeah.

(Video recording played in open court.)

MR. WATSON:  The league identified itself as a professional league.  It identified that it was contracting with players as a professional league.  It later identified that it would change and offer the option of scholarships for professionals to play alongside scholarship athletes.

And it recognized that, consistent with the contracts, the professional league and the players, like the plaintiffs, who signed professional contracts knew they were giving up eligibility.

THE COURT: Could the plaintiffs have signed a new contract to get scholarships rather than salaries?

MR. WATSON: There's no evidence in the record that the plaintiffs ever sought to amend their contract.

The contract allows the parties to the contract to amend by agreement of both parties of the contract. There's no evidence that the plaintiffs ever sought to amend that professional contract. There's no evidence in the record of them doing so, but there is the evidence in the record that the contract allowed the parties to the contract to amend by mutual signed agreement.

THE COURT: So can you compare the plaintiffs' contract to the ones that they say are similar or --

MR. WATSON: Yes, Your Honor.

THE COURT: -- in fact, if not in name, Carlyle and Dillingham?

MR. WATSON: Yes, Your Honor. We will do so.

THE COURT: You'll have a chance. Don't worry.

MR. PRICE: Okay.

MR. WATSON: Let me turn to those agreements.

THE COURT: Well, they are an exhibit to the complaint, I believe, Exhibit D.

MR. WATSON: I just -- they are Exhibit D. I wanted to call up some particular provisions for the Court.

Here is the claimed, quote/unquote, same agreement.

It is not the same agreement. Here is the agreement that the other players signed styled Overtime Elite NIL Endorsement Agreement.

Scope of services -- and remember, when we went through the plaintiffs' contract, we talked about the professional scope of services, playing in the league, playing in all-star games, playing in any other tournament requested by the professional league.

Here is the NIL scope of services in the incomparable contract. Scope of services: Talent will provide the following services to the company. Not an employee of the company, not --

THE COURT: What page are you reading from, just to help me out here?

MR. WATSON: This is Declaration Exhibit I, schedule --

THE COURT: I'm looking at the one that was attached to the complaint that was filed under seal.

MR. WATSON: Which one lays out the plaintiffs' duties or which one is incomparable?

THE COURT: Well, I think they are the same document. It's just a different --

MR. PRICE: It's Exhibit D.

THE COURT: You just filed yours last --

MR. WATSON: Oh, I was discussing -- thank you, Your

Honor.

I was discussing the contracts that the plaintiffs didn't submit but claimed that they were the same.

MR. PRICE: We did submit. We submitted one Bewley contract, one of the new version, one of the 1.0, one of the 2.0, Exhibit D.

THE COURT: Yes, that's what I have here.

MR. PRICE: Exactly.

MR. WATSON: So this is Schedule --

THE COURT: This is Exhibit D to the complaint which was filed under seal.

MR. PRICE: Correct.

THE COURT: Right.

MR. WATSON: And if it's the NIL agreement, it's Schedule A.

THE COURT: Schedule A. All right.

Okay. I see it. Description of service.

MR. WATSON: Schedule A, scope of services begins with: Talent will provide the following services, Your Honor.

THE COURT: I see it.

MR. WATSON: Thank you for correcting me.

THE COURT: No, I'm not correcting you. I'm just trying to get to the right page.

MR. WATSON: Talent will provide the following services to the company. Not employment, not benefits, not

professional work, scope and duties but, instead, services as following: Attend -- or follow the document content shoot day, social content appearance, promotional appearances, branded in-feed post on talent's Instagram account, branded story post on talent's Instagram, overtime fits modeling/photo shoot.

Those are not the same duties outlined in plaintiffs' contract which made them professional employees of a league. Those are services that talk about posting social media and attending photo shoots for social media.

That's what makes this agreement incomparable to the plaintiffs. The plaintiffs signed a professional agreement saying, our scope of duties are to play in a professional league and fulfill our professional obligations.

These are limited name, image, and likeness agreements that talk about attending photo shoots and posting on social media. They are not the same. They are incomparable.

The second point that was raised is whether the financial aid agreements are the same. The financial aid agreements are laid out and say, during the financial aid period, the institution shall provide student athletes with the financial aid set forth on Exhibit A -- and Exhibit A sets forth financial aid, not payment for a professional to play in a professional league -- sets forth during the financial aid period, the institution shall provide a student athlete with

and reimburse the costs of actual and necessary expenses set forth in Exhibit B.

And those actual and necessary expenses comply with the NCAA bylaws which detail what are actual and necessary expenses; transportation, housing, the expenses incurred. Not the play for payment that the plaintiffs obtained.

And finally, during the financial aid period, the institution shall provide student athlete with or reimburse the costs of the educational-related expenses set forth in Exhibit C. And those educational expenses in Exhibit C walk through the cost of education. It talks about the classroom, what classes are going to be attended.

It does not talk about the professional work duties of playing professionally in a professional league.

These are incomparable agreements, and they are not the same.

You could also look at what the dollar figures were attributed; and again, they are not the same. One is a salary plus bonuses plus equity plus professional benefits.

The other is financial aid and payment for posting social media or attending photo shoots for social media. Those are incomparable.

THE COURT: So your position -- I'll let you talk. I know you're just bursting to talk, and I don't blame you.

Your position is, once they signed that 2021

contract, they were professional players. And even if they had amended it, you would be in the same position you are today; is that correct?

MR. WATSON: We would -- that's not correct, because they also played professionally and collected that compensation for two years playing professionally in a professional league under a professional contract.

THE COURT: So I'll amend my statement.

Once they signed that contract and performed under it, for you that's enough. And even if they had amended it and gone under the second type of contract, which you say is incomparable, that wouldn't have changed your position?

MR. WATSON: It would not have changed the position of them executing a professional contract and performing under -- under professional obligations.

I will also say, when the name, image, and likeness interim rules came out, there was never a -- there was no evidence of an attempted change.

So if this gets into the intent of the plaintiffs here, the evidence is that the plaintiffs intended to be professionals, sign a professional agreement, and then perform under that agreement for two years.

THE COURT: Got it.

Okay. Mr. Price, I know you've been dying to say something.

MR. PRICE: That was -- there's a lot there, but I just want to reiterate, because we spend a lot of time talking about whether this was a professional contract and whether they were professionals.

I started my last section to say that entire argument is irrelevant, because their bylaws specifically allow you to sign the contract with a professional team. So we spent a lot of time talking about whether they were professional or not. That is --

THE COURT: But that same bylaw says only if they are paid for the necessary expenses.

MR. PRICE: Absolutely, and that's --

THE COURT: And your client signed a contract that said they got a $350,000 salary per year plus a -- I don't know if they got the bonus or not -- plus another $50,000 bonus.

So that's quite different than getting, you know, reimbursed for necessary expenses.

MR. PRICE: Sure.

THE COURT: So the bylaw doesn't seem to apply to the contract that they signed, the 2021 contract.

MR. PRICE: It applies because of the name, image, likeness. So the services under the contract, which I think my colleague here missed, if you go to page 6 of our Exhibit C and you go to 1.1, which he quoted from, but there's a large section of 1.1 that was skipped. So 1.1(b) --

THE COURT:  Let me get it.

MR. PRICE:  Okay.

THE COURT:  Okay.  I've got it.

MR. PRICE:  And if you -- it's a bigger paragraph.

So if you go down to (E), it begins to talk about those services, because they were compensated for the services they provided.

So if you start at (E), it says:  Various promotional and commercial activities of the league or the company set forth herein, performance of such other services, duties, and responsibilities as may be required -- may be reasonably requested of player by the company, the league, and its coaches and other staff, including, without limitation, participation in interviews, other media sessions required in connection with documentary film and other content the company creates or is creating in connection with the league, as further described in Section 7.2.

Section 7.2 is the five-page section that I mentioned earlier that starts with the heading Name, Image, and Likeness. And it goes on for five pages and describes what those services were.

So there are a number of red herrings that my colleague pointed out here, the number one being whether there was a professional contract.  Again, that is irrelevant, because the excess compensation was for the name, image, and

likeness.

So there's no provision that says it can't be an employment contract. There's no provision that says you can't use the word "salary." There's no provision that says if there are other responsibilities in the contract, it somehow negates the name, image, likeness that takes up five pages of this contract.

Again, when you look at the compensation that each player received, the players that signed the new version of the contract received a 300,000 NIL likeness compensation alone, so --

THE COURT: Where do you find that? I'm looking at Exhibit D. I don't find that at all.

MR. PRICE: So Exhibit D --

THE COURT: On Schedule A it does have about $45,000 of compensation for certain services as an independent contractor.

MR. PRICE: Sorry. Give me one second.

THE COURT: It's document 9-1 at page 13.

MR. PRICE: Yeah, I'm looking for the actual amount.

Okay. It's paragraph 9(a), Compensation. As compensation for the --

THE COURT: Hold on. Let me get it.

MR. PRICE: Sorry. It's page 7 of Exhibit D.

THE COURT: I see it. Okay.

MR. PRICE: "As compensation for use of the talent brand materials and talent's performance of services during the term, the company shall pay talent a total fee of up to 300,000, (the fee)."

MR. WATSON: Up to.

MR. PRICE: So, again, we talked about a lot of red herrings in the contract. The contract isn't perfect. I'll admit that.

The flaw in the contract is not the use of terms of salary, employment, the services, including other things. It's determining how much was the value of the name, image, likeness consideration in the contract.

And it's easy to determine that, because you look at what other players were paid. They were paid $300,000 for the use of their name, image, likeness, if not more. That's just one example we're looking at.

So we can look at the other contracts that assign that value to determine that at least, at least the exchange that they made for their name, image, likeness is worth at least 300,000.

And then that accounts for any excess that the defendant determines the plaintiffs received above the actual and necessary expenses.

MR. WATSON: There is no clear showing of likelihood of success when the plaintiffs' argument requires you to excise

the scope of the services A, B, C, D from the contract. That's what makes it a professional salaried contract that they bargained for in exchange for salaried compensation.

We would not be here on these facts if they had not included in their own contract A, B, C, and D, and they had agreed to an entirely different contract. That's why there is no clear showing of likelihood of success on an NIL dispute.

MR. PRICE: And that's another one of the red herrings that I maybe skipped.

Counsel is suggesting that if there are other obligations in the contract that it negates that -- the NIL elements of the contract. There's no provision of NCAA bylaws that I'm aware of that say that.

And this is precisely the broader issue here. The NCAA moved on their interim policy after public pressure, but they didn't create the guidelines. So in the absence of guidelines, these contracts were created based on the information known at the time.

If there was some type of guideline or bylaw that said, you know, the NIL portion of a contract has to be separated out in a separate contract in order for the NIL portion to be violated, but there's no bylaw that says that. There's no proclamation by the NCAA that says that. The first time we're hearing that is today.

MR. WATSON: We are not here on a rescission dispute.

There are enforceable agreements that were signed and performed, Your Honor.

THE COURT: Well, okay. Anything else to say?

MR. WATSON: And I would say that these contracts were entered before the interim NIL policy. They were not changed after the interim NIL policy.

The Bewleys themselves in the papers we submitted held themselves out as professionals. They knew they were contracting to give away their eligibility, and the NIL interim policy had nothing to do with that knowing entering of a contract.

MR. PRICE: Yeah, that's -- sorry. That's one more point, that that language in the contract is not an agreement to give up their rights to pursue a collegiate athletic career.

That language in the contract is a waiver of liability so that my clients couldn't sue OTE for the loss of their college eligibility.

It's not an agreement. It's not an endorsement of that belief.

THE COURT: No, but it's a warning, I guess.

MR. PRICE: It's a warning. It's a warning.

THE COURT: That you might lose your eligibility.

All right. Anything else, folks?

MR. WATSON: Nothing, Your Honor. Thank you.

MR. PRICE: Thank you.

THE COURT: Well, my sympathies are with the plaintiffs here, because they are kids who want to play for their team. They expected to play for their team when they went to school at Chicago State.

But I can't get over the actual contract as the defendant has argued it. This is an employment contract. There's no question about it. The Overtime league holds itself as a professional league. It talks about employment. It talks about salary.

And when they signed this, there's no question that they were signing it as an employee of a professional league. And I assume that they had every hope of going directly from there to the NBA or some other professional league, perhaps overseas. Who knows? I'm learning a little bit about basketball.

But that didn't happen, so they went to college instead, which is a good thing. But I don't think that the NBA is wrong in concluding that they did play for a professional league, and that disqualifies them under the bylaws of the NCAA. I said NBA. I meant NCAA.

I'm a little confused, maybe is the word, about the other contract, Exhibit D, because obviously those kids got some substantial money for performing as an independent contractor, but that doesn't really change the contract that the plaintiffs signed here, which is an employment contract. I

think it's just plain as day.

It may have been a mistake at the time or maybe in hindsight. Probably in hindsight. But I just don't see any way around that. And based on what I've seen here -- you can argue about whether these other two should have been disqualified as well. Maybe they should have. But that doesn't really affect the plaintiffs' contract that they have with Overtime Elite.

It's an unusual situation, but it's there. It's in black and white. And I think based on that alone, there's not a likelihood of success here on the state claim.

The antitrust claim is something obviously you could pursue and be -- ultimately succeed on. That's something that's really not before me today.

So I'm finding that there is no likelihood of success here. And even on a sliding scale, I think it's so strong that even a finding of irreparable harm -- and I think that there's a good argument for irreparable harm here just based on the facts that were presented to me. Even though I know we don't have any solid evidence on that, I think I could draw inferences that they're playing for Chicago State on a scholarship. That's what they have alleged.

And even if I take that at face value, I could see where there's a good argument for irreparable harm. But I just think the contract that they signed is so strong and is such

clear -- and is so clearly an employment contract with a professional league that there's very, very little chance of succeeding on that claim.

MR. PRICE: Sorry, Judge. Can I ask just one question?

THE COURT: You just did, but go ahead and ask another one.

MR. PRICE: Yeah. Just I was wondering what was your viewpoint on the exceptions under the NCAA bylaws that says that prospective athletes are allowed to sign professional contracts?

THE COURT: Yes, but this is way beyond an NIL contract. Your argument -- and I credit you for making the argument. It's a good lawyerly argument. You're saying that this is really an NIL contract.

In my view, it's not. It's an employment contract. I think it's very clear. It's much more than just an NIL contract. It includes NIL, but it's a lot more than just that, as counsel has stated.

So it's a conclusion that I have reached after considering everything I have before me today. So I just don't think there is grounds to issue a TRO.

I'm sorry about the effects that it has on these plaintiffs, very frankly. They seem like good, young men, and I hope that they are able to use their talents in the future.

But right now I'm looking at this as a matter of injunction law and contract law and everything else, and I just find that there's very little chance of succeeding on that claim.

So I'm denying the TRO. There is still -- you have a motion for preliminary injunction. I don't know if you want to do some discovery and see maybe if there's something that you could discover that might change that result.

But right now in front of me, this is an emergency motion for TRO, and I'm denying it.

So I guess where do we go from here? Has there been any movement on this administrative remedy?

I'm not really addressing the administrative remedy. It seems to me something that's at least in process with Chicago State at this point.

MR. WATSON: Yes, Your Honor.

THE COURT: The plaintiffs are able, I guess, to jump in on that if they want to.

MR. WATSON: The plaintiffs submitted statements in the reinstatement request. The Chicago State is involved in that process. The NCAA is involved in that process.

It is moving on an expedited basis. There are rules that apply to it, and I'm happy to spend the Court's time on it. But the focus of my answer is, yes, it's moving forward. Yes, we expect to get an expedited review of that.

THE COURT: What does that mean? What is the timing on that?

MR. WATSON: Weeks. So we're in the -- we are in the one week out from their reinstatement request.

Let me just confer quickly, Your Honor, if I may.

(Counsel conferring.)

MR. WATSON: Your Honor, I, on behalf of the NCAA, expect a decision today from the first level. If --

THE COURT: But then there's an appellate level, right?

MR. WATSON: If Chicago State seeks an appeal, that would be another process that would take weeks.

THE COURT: Well, what about the plaintiffs? You say that they have initiated this thing?

MR. WATSON: They have not. The administrative right for reinstatement is pursued by the member institution.

THE COURT: I see. So the plaintiffs here cannot seek review of the decision?

MR. WATSON: Let me -- it's the school's right. It's the school's right, Your Honor.

THE COURT: It's the school's right only. And they have no standing to join that or --

MR. WATSON: I mean, they've submitted statements. There are hearings that are made. There -- you know, if there is a dispute about the factual findings, there can be a process

to challenge the factual findings.

THE COURT: They can, the plaintiffs can?

MR. WATSON: Yes, Your Honor.

THE COURT: You're getting some help from your friend there.

MR. WATSON: I appreciate all the help I can get.

THE COURT: All right. So far you're doing okay.

Well, right now I'm denying the TRO. The preliminary injunction would, I guess, stand -- I don't know if you want to see if this appeal process is going to be -- or the review process, let me call it that, is going to take its course.

It's really up to the plaintiffs at this point to see what we do next.

MR. PRICE: I think we expect additional guidance from the legislature on defining what an NIL contract is under the statute. So that may be a part of the --

THE COURT: From the legislature?

MR. PRICE: Yes.

THE COURT: The Illinois General Assembly?

MR. PRICE: Yeah.

THE COURT: Which isn't in session anymore, I don't think?

MR. PRICE: The sponsor of the NIL statute in Illinois is a good friend.

THE COURT: Okay. Well, let's not get too close to

that one. We have other cases in this building that deal with similar issues.

So I'm not sure what you mean. I mean, I can set this down for a status in 30 days, 60 days, something like that, and see where you're at.

MR. PRICE: Thirty days.

THE COURT: And maybe if you can give me a joint status report as to -- if you're going to proceed with discovery or if you're going to re-file the preliminary injunction motion or something like that, you can let me know as well. I have got to find my calendar.

We could do it the 12th or the 14th of December. Today is the 14th. So why don't we just say -- why don't we say 10:00 on the 14th.

MR. WATSON: Could we do it on the 14th, Your Honor?

THE COURT: Yes.

MR. WATSON: Thank you. And then would you like a JSR in advance of that?

THE COURT: Yes, I would, at least by the 11th, let's say.

MR. WATSON: Thank you, Your Honor.

MR. REILLY: Would that be a telephonic status, Your Honor?

THE COURT: No, let's do it in person. I think we always have things to talk about here.

MR. WATSON: Happily.

THE COURT: All right. Well, thank you for all the hard work. I know there's some emotional issues here as well as the legal issues.

And I see the plaintiffs here. They seem like nice young men. And we have to follow the law.

Okay. On 12/14 at 10:00.

MR. WATSON: Thank you, Judge.

MR. PRICE: Thank you.

THE COURT: Thank you.

(Proceedings concluded.)

C E R T I F I C A T E

I, Nancy L. Bistany, certify that the foregoing is a complete, true, and accurate transcript from the record of proceedings on November 14, 2023, before the HON. ROBERT W. GETTLEMAN in the above-entitled matter.

*/s/ Nancy L. Bistany, CSR, RPR, FCRR*          November 14, 2023

    Official Court Reporter                    Date
    United States District Court
    Northern District of Illinois
    Eastern Division