IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW BEWLEY and RYAN BEWLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 23 CV 15570 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiffs Matthew Bewley and Ryan Bewley bring their three-count complaint against defendant National Collegiate Athletic Association ("NCAA") for violation of § 15(a) of the Student-Athlete Endorsement Rights Act, 110 ILCS 190/15(a) (Count I), and violations of § 1 of the Sherman Act, 15 U.S.C. § 1, for unreasonable restraint of trade (Count II), and group boycott and refusal to deal (Count III). In relevant part, plaintiffs seek injunctive relief, restraining defendant from enforcing allegedly unlawful and anticompetitive regulations against plaintiffs. On November 1, 2023, plaintiffs moved for a temporary restraining order ("TRO") and preliminary injunction against defendant's enforcement of its determination that plaintiffs are ineligible to participate in collegiate athletics because they had played basketball for a professional league (Doc. 3). On November 14, 2023, the court held a hearing on plaintiffs' motion for TRO, which the court denied. Plaintiffs filed a motion for reconsideration regarding their motion for TRO on December 11, 2023 (Doc. 26). For the reasons discussed below, the court denies plaintiffs' motion for reconsideration (Doc. 26), and denies plaintiffs' motion for a preliminary injunction (Doc. 3).

**BACKGROUND**

1

According to the factual allegations in the complaint, plaintiffs are 19-year-old brothers who attended high school at Overtime Elite Academy ("OTE"), which is an "elite basketball academy" in Georgia. Plaintiffs allege that they signed agreements with OTE that included athletic scholarships and the "sale and transfer of Plaintiffs' [name, image, and likeness] rights to Overtime Elite in exchange for a negotiated market value compensation package," effective July 1, 2021. The agreements stated that by signing, plaintiffs risked "immediately los[ing] any and all eligibility to participate in . . . collegiate athletics of any form, nature or variety . . . including . . . the [NCAA]," which is an amateur intercollegiate athletics program.

After graduating from OTE, plaintiffs accepted athletic scholarship offers from Chicago State University ("Chicago State"), a member of the NCAA, to play in its men's basketball program.[1] In June 2023, plaintiffs applied for eligibility through defendant's amateurism certification process. Plaintiffs explain that the NCAA Eligibility Center ("the Eligibility Center") contacted Chicago State on June 27, 2023, and "indicated that Plaintiffs would likely be ineligible for collegiate competition because they previously played for a professional team (OTE) and received compensation in excess of actual and necessary expenses." On October 31, 2023 (one week prior to plaintiffs' first scheduled game at Chicago State), defendant issued its decision that plaintiffs were ineligible to compete under "Final: Non-Certified" status.

Plaintiffs allege that defendant's ineligibility decision is inconsistent with its determination that some of their former classmates and teammates at OTE are eligible for participation. For example, defendant determined that Rob Dillingham ("Dillingham") and Kanaan Carlyle ("Carlyle") remain eligible despite playing basketball for compensation from OTE. Plaintiffs allege that defendant certified Dillingham and Carlyle based on its interim

---

[1] Chicago State is not a party to the instant action, although it began defendant's administrative reinstatement process on plaintiffs' behalf after they filed this lawsuit.

policy for Name, Image, and Likeness ("NIL") compensation.

According to plaintiffs, effective July 1, 2021, defendant adopted an interim policy for NIL compensation following the Supreme Court's ruling in NCAA v. Alston, 141 S. Ct. 2141 (2021). Plaintiffs allege that defendant's interim NIL policy suspended its enforcement of "many NIL restraints and restrictions and allowed prospective and current student-athletes to receive compensation for the sale of their NIL rights in accordance with state law." Defendant's NIL policy states that:

> "For institutions in states with NIL laws or executive actions with the force of law in effect, if an individual or member institution elects to engage in an NIL activity that is protected by law or executive order, the individual's eligibility for and/or the membership institution's full participation in NCAA athletics will not be impacted by application of NCAA Bylaws unless the state law is invalidated or rendered unenforceable by operation of law."

According to plaintiffs, "[b]y certifying Mr. Dillingham and other former OTE athletes, the NCAA determined that competing for OTE and receiving compensation from OTE was permissible under its interim policy." Yet, plaintiffs complain that defendant denied their certification despite having "the same duties and obligations as Mr. Dillingham under their respective contracts with OTE" for allegedly comparable compensation.

Defendant counters that OTE changed its professional model in the fall of 2022, and began offering athletes a "scholarship option," rather than a "salary," which preserved college eligibility for athletes like Dillingham and Carlyle. Conversely, plaintiffs' contracts with OTE provided that "[d]uring the course and scope of employment, the Player shall perform work, duties and services at the direction of the Company and pursuant to the terms and conditions of the Agreement." Plaintiffs argues that in determining their "Final: Not Certified" decision, defendant "denie[d] [their] eligibility largely based on the compensation they received in exchange for their name, image, and likeness."

Further, plaintiffs allege that defendant's decision to deny their eligibility is "in direct conflict with the Illinois Student-Athlete Endorsement Rights Act," which states that:

> "Compensation from the use of a student-athlete's name, image, likeness, or voice may not affect the student-athlete's scholarship eligibility, grant-in-aid, or other financial aid, awards or benefits, or the student-athlete's intercollegiate athletic eligibility . . .
>
> . . . the National Collegiate Athletic Association, the National Association of Intercollegiate Athletics, and the National Junior College Athletic Association, shall not prevent, or otherwise enforce a contract, rule, regulation, standard, or other requirement that prevents a student-athlete at a postsecondary educational institution from earning compensation as a result of the use of the student-athlete's name, image, likeness, or voice." 110 ILCS 190/15.

Even if the court determines that plaintiffs' contracts with OTE were impermissible to confer NCAA eligibility, plaintiffs allege that defendant's enforcement of NCAA Bylaw 12.2.3.2.1 violates federal antitrust law by restricting compensation for prospective student-athletes. Bylaw 12.2.3.2.1 limits the compensation that prospective student-athletes may receive from participation on a "professional team" to "actual and necessary expenses."

According to plaintiffs, citing Bylaw 12.2.3.2.1, defendant "made the arbitrary determination that [plaintiffs] received compensation from a professional team that was above [defendant's] threshold of actual and necessary [expenses]," while their teammates (who received allegedly similar compensation) were permissibly compensated. Defendant counters that the Eligibility Center's amateurism certification review summary for plaintiffs was based on its factual determinations "that the prospective student-athlete[s] entered into an agreement with a professional team that provided payment above actual and necessary expenses, as well as participated with a professional team." Douglas Healey, the Director of Academic and Amateurism Review for the Eligibility Center, has stated that OTE confirmed that plaintiffs received performance bonuses, apparel royalties, and group licensing payments, in addition to

4

their base salary, which defendant determined were impermissible.

## **DISCUSSION**

First, the court considers plaintiffs' motion to reconsider its order denying their request for a TRO. Courts grant motions for reconsideration when: (1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) there has been a controlling or significant change in the law since the submission of the issue to the court; or (5) there has been a controlling or significant change in the facts since the submission of the issue to the court. See Bank of Waunakee v. Rochester Cheese Sales Inc., 906 F.2d 1185, 1191 (7th Cir.1990).

In the instant case, plaintiffs argue that the court should reconsider its order denying their TRO "based on additional evidence and authority." The court, however, agrees with defendant that plaintiffs have not pointed to any change in the facts, or to the court's misunderstanding of any legal or factual argument in denying plaintiffs' motion for a TRO. Thus, the court denies plaintiffs' motion to reconsider. While plaintiffs have filed a notice of supplemental authority, and attached a copy of an order granting the plaintiffs' motion for a TRO in Ohio v. NCAA, Case No. 1:23-CV-100, (N.D. W.V. Dec. 13, 2023), that order is not binding upon this court, and the case is readily distinguishable from the instant case.

Next, the court considers plaintiffs' motion for preliminary injunction. Federal courts have the power to issue preliminary relief where the moving party has demonstrated: (1) some likelihood of prevailing on the merits; (2) some likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in that party's favor; and (4) that an injunction is in the public interest. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20

(2008).

The court begins by evaluating plaintiffs' likelihood of success on their claim under state law. According to plaintiffs, to enter a preliminary injunction based on plaintiffs' claims under the Student-Athlete Endorsement Rights Act, the court must determine whether plaintiffs were deemed ineligible due to their compensation from OTE, and whether plaintiffs received such compensation for use of their NIL. Plaintiffs argue that "[i]t is undisputed that the NCAA has declared [plaintiffs] ineligible based on the terms of the compensation they received in exchange for use of their NIL," which violates state law.

The court disagrees, and finds that plaintiffs have failed to establish that that they are likely to succeed in showing that they were denied eligibility based on compensation from OTE for use of their NIL. As defendant argues, and as the court determined in its hearing on plaintiffs' TRO motion, plaintiffs' contracts with OTE were "so clearly an employment contract with a professional league," and although plaintiffs' contracts included compensation for NIL, the contracts were "much more than just an NIL contract." As defendant argues, Dillingham and Carlyle's contracts do not "change the contract that the plaintiffs signed here."

The Eligibility Center's amateurism certification review summary further supports the court's conclusion. In its review summary, the Eligibility Center concluded that "the prospective student-athlete[s] entered into an agreement with a professional team that provided payment above actual and necessary expenses." Moreover, Douglas Healey has explained that OTE confirmed that plaintiffs received performance bonuses, apparel royalties, and group licensing payments, in addition to their base salary, which defendant determined were impermissible. Thus, because plaintiffs have not clearly demonstrated that they were compensated only for use of their NIL, plaintiffs have not established a likelihood of success on their state law claim.

It is a separate question whether plaintiffs have established a likelihood of success on their claims under federal antitrust law for unreasonable restraint of trade and unlawful group boycott. Plaintiffs acknowledged during this court's November 14 hearing that they sought a TRO based only on their state law claim, but their motion for a preliminary injunction includes their federal claims. In any case, the court agrees with defendant that plaintiffs have not established a likelihood of success on their antitrust claims, which they assert without conducting discovery or presenting any evidence. The court rejects plaintiffs' argument that "[w]hile a determination of the likelihood of success on an antitrust claim is typically a fact intensive analysis requiring substantial discovery, the majority of the factual and legal antitrust questions before the court have been determined in prior cases."

Plaintiffs rely on NCAA v. Alston, 141 S. Ct. 2141 (2021), and O'Bannon v. NCAA, 802 F.3d 1049 (9th Cir. 2015), to argue that defendant has placed an anticompetitive, unreasonably restrictive, and artificial wage cap on prospective student-athletes. However, Alston and O'Bannon were brought by current and former college student-athletes to challenge NCAA bylaws limiting the education-related compensation and benefits that were available to college student-athletes competing in the NCAA. See Alston, 141 S. Ct. at 2151; O'Bannon, 802 F.3d at 1055. The instant case is distinguishable because it is brought by prospective college student-athletes, who may accept purportedly "fair compensat[ion]" during high school by choosing not to risk potential eligibility to compete in intercollegiate athletics.

As defendant argues, the Supreme Court has determined that amateurism is a procompetitive justification that protects the distinction between college and professional sports. See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 104 S. Ct. 2948, 2968–69 (1984). Plaintiffs do not explain why this court should determine that the compensation

limitation at issue (i.e., defendant's limitation on compensation for "actual and necessary expenses" during the amateurism certification process) is similar to the transfer eligibility rule at issue in Ohio v. NCAA, Case No. 1:23-CV-100, (N.D. W.V. Dec. 13, 2023). Unlike the transfer eligibility rule, Bylaw 12.2.3.2.1 directly promotes defendant's "'unique product' of amateur sports." Consequently, the court concludes that plaintiffs have not established a likelihood of success on their claims that defendant's bylaws are unreasonably anticompetitive or restrictive.

Because plaintiffs have not demonstrated a likelihood of success on any of their claims, the court does not evaluate whether plaintiffs have established that there is no adequate remedy at law, or whether plaintiffs will suffer an irreparable harm without preliminary relief. The court also does not determine whether the balance of hardships, or public interest, favors granting plaintiffs' motion. The court denies plaintiffs' motion for preliminary injunction.

## CONCLUSION

For the reasons discussed above, the court denies plaintiffs' motion for reconsideration (Doc. 26), and denies plaintiffs' motion for a preliminary injunction (Doc. 3).

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: January 10, 2024**